75 N.J. Super. 480 (1962)
183 A.2d 467
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
FAYE WASSERMAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued July 2, 1962.
Decided July 13, 1962.
*483 Before Judges PRICE, SULLIVAN and LEWIS.
Mr. Aaron Marder argued the cause for appellant (Mr. Gerold Kanengiser, attorney; Mr. Marder, of counsel).
Mr. William A. O'Brien, Assistant Prosecutor, argued the cause for respondent (Mr. Lawrence A. Whipple, Hudson County Prosecutor, and Mr. O'Brien, attorneys).
The opinion of the court was delivered by LEWIS, J.A.D.
Defendant Faye Wasserman, 66 years of age, appeals from a judgment of the Hudson County Court, Criminal Division, entered on April 6, 1962, revoking her probation and suspended sentences and imposing new sentences. There had been 16 indictments under our criminal statutes against her involving N.J.S. 2A:87-1 (abortion), N.J.S. 2A:96-6 (placing or assisting in *484 placing a child for the purpose of adoption without proper authority), and N.J.S. 2A:96-7 (placing of children for adoption, other than by approved agency, for a consideration). Following a plea of guilty as to one indictment and her pleas of non vult as to the remaining 15 indictments, the sentencing court levied fines totalling $7,000 and sentenced her to the New Jersey State Reformatory for Women at Clinton for respective indeterminate terms (the maximum limit of any single term was five years), all to run concurrently. The aggregate of the several respective indeterminate terms on the 16 indictments was 28 years. At the same time, the court suspended the reformatory sentences and placed defendant on probation for five years.
Thereafter, on February 16, 1962, Mrs. Wasserman was arrested on two criminal complaints as the result of her alleged dealings with one Margaret Boyle and negotiations indirectly with a Patricia Close. The Boyle matter was referred to the grand jury, and the complaint respecting Close was withdrawn by the prosecutor. On February 24, 1962 defendant was charged with violating her probation and the notice thereof, duly served on the probationer, concluded with the specific statement that:
"(1) You have failed to avoid injurious and vicious habits.
(2) You have again become involved with the law.
(3) You have continued with your illegal behavior in that:
a. On or about Jan. 19, 1962, you negotiated with Jerome Close, husband of an expectant mother for the sale of her unborn baby (Mrs. Patricia Clark Close).
b. On or about Nov. 16, 1961, Dec. 5, 1961 and Dec. 26, 1961, you did negotiate with an expectant mother for the sale of her unborn baby (Margaret Boyle).
You may, if you so desire, retain counsel to represent you at the hearing."
There was a full hearing on the charges. Defendant was represented by counsel and three days were consumed in the examination and cross-examination of 13 witnesses, arguments of counsel and customary trial procedure. The *485 trial judge had a strong and abiding conviction, based upon the evidence produced, which he characterized as being "beyond a reasonable doubt," that defendant did violate her probation and was again involved in the "Same type of crime. The same nefarious type of operation" for which she had been previously convicted and sentenced. Accordingly, the probationary period and the suspended sentences were revoked and, on April 6, 1962, defendant was resentenced and committed to the aforesaid Women's Reformatory for an indeterminate term not to exceed five years. Parenthetically, we note that in such a proceeding the trial judge was only required to have had reasons to believe the violation charges were true in order to justify the revocation. State v. Moretti, 50 N.J. Super. 223, 237 (App. Div. 1958). Petition for release on bail pending appeal was denied by order of this court on May 5, 1962.
We have studied the record and have reached a determination that the judgment of the County Court should not be disturbed. No useful purpose would be served by extending this opinion with a review and an analysis of the proofs. There is ample evidence to support the termination of probation and the imposition of new sentences. Defendant was accorded an adequate hearing, as contemplated by N.J.S. 2A:168-4 and our decisional law. See State v. Zachowski, 53 N.J. Super. 431 (App. Div. 1959); State v. Pascal, 1 N.J. 261 (1949); State v. Haber, 132 N.J.L. 507 (Sup. Ct. 1945). The ultimate sentence imposed was within statutory limits and was not "manifestly excessive." State v. Johnson, 67 N.J. Super. 414, 432 (App. Div. 1961); also State v. Dickerson, 72 N.J. Super. 459, 464 (App. Div. 1962). We are not impressed with the New York precedent (People v. Slater, 304 N.Y. 896, 110 N.E.2d 503 (Ct. App. 1953)) to which we have been cited by defendant. In that case a violation of the New York adoption statute was involved, and defendant's sentence was reduced to six months. Unlike the instant case, the defendant there was sentenced to prison *486 and, moreover, his acts of criminality were not as extensive and flagrant as those of Mrs. Wasserman.
On this appeal from a judgment in a summary statutory proceeding, defendant for the first time questions the constitutionality of two of the three statutes under which she had been convicted. Ordinarily, a habeas corpus proceeding is the remedy pursued to collaterally challenge an alleged unconstitutional statute. In re Kelly, 123 N.J. Eq. 489 (Ch. 1938), affirmed per curiam sub nom. McRell v. Kelly, 124 N.J. Eq. 350 (E. & A. 1938), overruled on other grounds Eggers v. Kenny, 15 N.J. 107 (1954); 5 Anderson, Wharton's Criminal Law & Procedure, sec. 2228, p. 463 (1957). Cf. Annotation, 32 A.L.R. 1054. To avoid "piecemeal" litigation, which is disapproved in our modern practice, we shall here proceed to consider the merits of that issue. Note, State v. Jenkins, 32 N.J. 109, 117 (1960), reversing 57 N.J. Super. 93, 103 (App. Div. 1959).
The two criminal statutes under attack are N.J.S. 2A:96-6 and N.J.S. 2A:96-7. They spell out a legislative objective which appears to be obvious from a verbatim reading of their text. We quote:

"2A:96-6. Placing or assisting in placing child for purpose of adoption without proper authority
No person, firm, corporation, association, or agency shall place, offer to place, or in any manner assist in the placement of a child in the home of any other person, or persons for the purpose of adoption, other than in the home of a brother, sister, aunt, uncle, grandparent or step-parent of such child, unless such person, firm, corporation, association, or agency shall be the natural or adopting parent of the child, or shall have been approved for such purpose as provided by law. Any person, firm, corporation, association or agency violating this section shall be guilty of a misdemeanor. L. 1953, c. 265, p. 1779, § 1." (Emphasis supplied); and

"2A:96-7. Placing of children for adoption; other than by approved agency, for consideration forbidden; exception
No person, including a natural parent or parent by adoption, and no firm, corporation, association or agency, other than an agency approved to place children for adoption as provided by law, shall *487 place, offer to place, or in any manner assist in the placement of a child in the home of any other person or persons for the purpose of adoption and, in so doing, take, receive or pay any money or anything of value, or undertake or discharge any financial obligation, except in connection with the birth and any illness of the child. Any person, including a natural parent or parent by adoption, and any firm, corporation, association or agency, other than an agency approved to place children for adoption as provided by law, violating this section, shall be guilty of a high misdemeanor. L. 1953, c. 265, p. 1779, § 2." (Emphasis supplied)
During the 1953 session of the Legislature there was also adopted N.J.S.A. 9:3-19 (L. 1953, c. 264, sec. 3, p. 1769), which pertains to the civil aspects of the same subject. The pertinent provision thereof (section 19, subd. A) provides:
"No person, firm, corporation, association or agency shall place, offer to place, or assist in the placement of any child in New Jersey for the purpose of adoption, unless such person, firm, corporation, association or agency shall be the natural or adopting parent of the child or shall have been approved for such purpose by the Department of Institutions and Agencies and such approval shall not have been rescinded at the time of placement or offer for placement; provided, however, that this prohibition shall not apply to the placement of a child for the purpose of adoption with a brother, sister, aunt, uncle, grandparent or step-parent of such child. The Superior Court, in an action by the Commissioner of the Department of Institutions and Agencies, shall restrain any party found by the court to have violated this subsection A from any further violation of this subsection."
It is entirely appropriate for us to consider that enactment as an extrinsic aid in our search for legislative intent. Key Agency v. Continuental Cas. Co., 31 N.J. 98, 103 (1959); Morris Co. Industrial Park v. Thomas Nicol Co., 35 N.J. 522, 526 (1961); 2 Sutherland Statutory Construction (3d ed., Horack, 1943), sec. 5201 "Statutes in pari materia  To be construed together." The aforequoted statutory excerpts were all a part of the 1953 revision of our Child Adoption Laws, and were companion measures, consecutively numbered in the Legislature; they were *488 sponsored by the same legislator, and were adopted into law on the same day. They culminated four years of study, incorporated in substance the recommendations of the Adoption Advisory Council and its advisory committee, and were subject to a public hearing before the Senate Committee on Institutions and Agencies (see Legislative Index (1953) and record of hearing on Senate Bill No. 235, April 7, 1953). These statutes must be read in their entirety. It is fundamental in the construction of legislation that every part of a statute must be considered in the determination of the meaning of any of its parts. McCaffrey, Statutory Construction, sec. 8, p. 35 (1953), citing 1 Blackstone's Commentaries, p. 89. The application of this basic canon emphasizes the fact that the language employed by the lawmakers in treating the overall subject of adoption was unmistakably positive, clear and precise. True, the scope of the challenged law is broad and comprehensive  but that was the declared intent of the Legislature when it so explicitly proclaimed a public policy requiring all adoptions to be channeled through expressly approved sources.
The legislative intent is a controlling factor and, to ascertain its purpose, recourse to the statutory background, the circumstances of passage and the mischief at which it is aimed may weigh heavily upon the issue of meaning and interpretation. In making such an examination we find it to be clearly revealed that a unified, coherent system for the legal adoption of children was contemplated, and that public policy demanded a liberal construction of such laws to the end that all placements of children for adoption, other than with close relatives, should be prohibited to any person, corporation, agency or party ("no matter how innocent or well meaning they may be" including "the ministers, the doctors and well-wishers, those who want to save a home or embarrassment by direct dealings") which has not been approved for that purpose by the Department of Institutions and Agencies. A paramount and dominant objective *489 was to prevent the trafficking for profit in human lives and to extinguish from our society the so-called "black market" and "gray market" in babies.
A unique underlying feature encompassed by the mandate for state-approved agency participation is the availability and utilization of supervised resources, special facilities, experienced investigators and trained case workers. These are salutary benefits which inure to the transacting parties, and include the protection of (1) the natural parents from the consequences of a hasty decision made under distressing circumstances, (2) the prospective or adopting parents by ascertainment of their qualifications and furnishing information respecting the physical, mental and other characteristics of the child, and (3), most important of all, the child's best interest and welfare.
The central core of defendant's contention is that the statutes in question are unreasonable in that they prescribe absolute prohibitions regardless of intent, embrace not only acts that might be reprehensible but also others which it is not reasonable to assume were intended to be made criminal, and that perfectly innocent conduct, totally free from any trace of venality, is within the reach of either or both of the criminal statutes. It is argued that the words "in any manner assist" and the term "anything of value" (italicized in the quoted sections supra) are too ambiguous, vague and uncertain, and are so indefinite and all-inclusive as to render the legislative enactments void from their inception.
In defendant's brief our attention is directed to examples which were presented to illustrate the unreasonableness of the criminal statutes under review and their capacity for entrapping the innocent, e.g., "If a natural mother desired to place her child for adoption with a close friend, any lawyer (including one employed by a legal aid society) could be charged with violating R.S. 2A:96-6, if he advised the proposed placement was proper. If he received a fee he could be charged with violating R.S. 2A:96-7." There is a two-fold conceptual answer to that argument: (1) professional *490 advice as to a client's rights is not within the prohibition "in any manner assist in the placement of a child * * *," and (2) the lawyer's responsibility is succinctly stated in the following excerpt from an article appearing in the December 1955 issue of the American Bar Association Journal:
"When clients appeal to their lawyer for assistance in securing a child, the lawyer can play a constructive role in indicating the legal limitations which apply under laws requiring licensing of child-placement agencies and which forbid lawyers or others from engaging in placement. He can explain the reasons for such laws. He can outline the hazards to the client, to the child and to the community." Elson and Elson, "Lawyers and Adoption: The Lawyer's Responsibility in Perspective," 41 A.B.A.J. 1125, 1128 (1955).
See also, "Bar Cautioned On Assisting In Placing Child For Adoption," 85 N.J.L.J. 337 (June 21, 1962). Moreover, with regard to the several hypothetical situations envisioned by defendant, which here need not be detailed, we are guided by the pronouncement of our Supreme Court in State v. Monteleone, 36 N.J. 93, 99 (1961), viz:
"That there may be marginal cases in which it is difficult to determine the side on which a particular fact situation may fall, furnishes insufficient reason to hold the language of a penal statute too vague or uncertain * * *. If a statute is reasonably appropriate in its overall approach, it should be upheld notwithstanding that it may be invalid in its application in special circumstances or fringe areas."
At oral argument counsel for the defendant presented copies of the opinion in United States v. Cardiff, 344 U.S. 174, 73 S.Ct. 189, 97 L.Ed. 200 (1952), and stressed the statement therein that "The vice of vagueness in criminal statutes is the treachery they conceal either in determining what persons are included or what acts are prohibited." We also note the remarks of the opinion writer, Mr. Justice Douglas, that "Words which are vague *491 and fluid * * * may be as much of a trap for the innocent as the ancient laws of Caligula." These juridic concepts are basic but are here inapplicable. The plain, everyday understanding of the expressions "in any manner assist" and "anything of value" was used by the Legislature in the broadest sense of such words, to convey an intended prohibition that could not be misunderstood. Such language is not obscure and in its contextual use in the statutes under review is not unconstitutional. An act of the Legislature "carries a strong presumption of conformity with the organic law, and mere doubts are not sufficient to negate the presumption," and where it is capable of two possible constructions, the one under which it can be held constitutional will be adopted. State v. Monroe, 30 N.J. 160, 165 (1959). Accord, 3 Sutherland, op. cit. supra, sec. 5823, p. 118. Cf. State v. Joas, 34 N.J. 179, 185 (1961); and State v. Frankel, 42 N.J. Super. 7, 11 (App. Div. 1956), wherein this court said:
"It is, however, common to find regulatory penal statutes or ordinances which are necessarily couched in terms of fairly broad scope because of the peculiar nature of the subject matter in question."
The defendant also urges that the use of the word "adoption" in the penal statutes, without stating the kind of adoption intended, is unconstitutionally vague and uncertain. Adoptions were unknown to the common law and may be effected in this State only by judgments of a court of competent jurisdiction. When the Legislature speaks of adoption, it refers to the only legal type susceptible of judicial recognition. For a general review of the subject of "Adoptions" and the New Jersey case decisions, see 7 N.J. Practice (Clapp, Wills and Administration), c. 20, pp. 529 et seq. (1962); Editorial Notes, "Survey of New Jersey Adoption Law," 16 Rutgers L. Rev. 379 (1962).
Defendant was an active participant in the kind of nefarious business that public policy condemns and which the Legislature prohibits. The judgment of the trial court *492 committing defendant to the New Jersey Reformatory for Women at Clinton for an indeterminate period not to exceed five years is affirmed.