78 N.J. Super. 273 (1963)
188 A.2d 416
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ALEXANDER SEGAL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 14, 1963.
Decided February 15, 1963.
*276 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Samuel P. Orlando argued the cause for appellant (Mr. Abraham Greenberg, attorney).
Mr. Norman Heine, County Prosecutor of Camden County, argued the cause for respondent (Mr. Albert J. Scarduzio, Assistant Prosecutor, on the brief).
The opinion of the court was delivered by FREUND, J.A.D.
Defendant appeals from a judgment of conviction entered upon a jury verdict in Camden County Court for unlawfully placing a child for adoption and receiving money, in violation of N.J.S. 2A:96-7. Segal was sentenced to a term of three to five years in State Prison.
The statute under which Segal was convicted reads as follows:
"No person, including a natural parent or parent by adoption, and no firm, corporation, association or agency, other than an agency approved to place children for adoption as provided by law, shall *277 place, offer to place, or in any manner assist in the placement of a child in the home of any other person or persons for the purpose of adoption and, in so doing, take, receive or pay any money or anything of value, or undertake or discharge any financial obligation, except in connection with the birth and any illness of the child. Any person, including a natural parent or parent by adoption, and any firm, corporation, association or agency, other than an agency approved to place children for adoption as provided by law, violating this section, shall be guilty of a high misdemeanor."
The essential facts presented at the trial were these. Perry De Jesus was born September 9, 1960 at Cooper Hospital in Camden, N.J. He was the natural son of Leo and Florence De Jesus, residents of Camden. Several months before Perry's birth, Segal telephoned and later visited Mrs. De Jesus concerning the disposition of her unborn child.
Mrs. De Jesus testified that she told defendant she did not wish to bring the child home from the hospital because her husband had typhoid fever. The doctor had warned her not to bring the child home until her husband's health had improved. Defendant was in the meantime to temporarily place the child. In contrast, defendant testified that Mrs. De Jesus requested that he place the child permanently for adoption, since she was unemployed and both she and her husband were ill.
Perry was Mrs. De Jesus' fifth child. She did not know where the other four were, since "Segal took care of it." She was originally "referred to him by a girl, Tootsie"; and "he made all the arrangements with the children I had." "The first child I received $40, second $15, third one nothing, fourth one $40." She repeatedly denied, however, receiving any money for Perry.
Some time in April or May 1960 Sheldon and Iris Adler, residents of Philadelphia, Pa., contacted defendant by telephone seeking the adoption of a baby. A few days later, a meeting was held in defendant's office in Philadelphia. According to Adler, defendant said at this meeting that a baby was to be born about Labor Day 1960 and that defendant, for a fee of $1,500, "would take care of all the arrangements." *278 Mr. Adler's understanding was that the fee would be used to pay for the mother's prenatal care, doctor and hospital expenses. On rebuttal, Mr. Adler added that $500 of the fee was to pay for "an obstetrician for prenatal care, and a private or semi-private bed in a good hospital * * * as it had in some cases in the past. The balance of the $1,000 was to be paid to Mr. Segal as a fee for himself, the other attorney and other incidental expenses at the hospital." Mrs. Adler, who accompanied her husband to Segal's office, substantially corroborated Mr. Adler's testimony concerning the application of the $1,500.
Of the total $1,500, one-third was to be paid to Segal May 14, a few days after the initial meeting. Another third of the fee was to be paid "upon delivery of the child," and the final third was to be given when the adoption was officially approved in Pennsylvania. There is a sharp conflict in the testimony concerning how much money Segal turned over to Mr. and Mrs. De Jesus. Defendant admitted that on May 14, 1960 he received $500 in cash from the Adlers and testified that he began making weekly payments of $20 in cash to Mrs. De Jesus  allegedly for her prenatal care. These payments continued until September 8, when Mrs. De Jesus entered the hospital, and amounted to a total of $380.
Mrs. De Jesus, as noted, repeatedly denied receiving any money from Segal. Although she admitted writing several letters in July 1960 which implied that she was receiving money from him, Mrs. De Jesus testified that defendant never gave her any money because she refused to "give him my son." She stated that later, when she demanded Perry's return, defendant attempted unsuccessfully to offer her $700 to gain her acquiescence to the adoption.
Adler testified that after Segal learned of Perry's birth, defendant called Adler "at my office to congratulate me and to tell me that I was now a daddy and had a little son. The boy born was Perry De Jesus in the Cooper Hospital in Camden." Segal made arrangements for the delivery of the child to the Adlers.
*279 On September 10 Segal met with the Adlers in the vicinity of the hospital. When Segal requested the second installment of $500, Mr. Adler offered to write a check for $400. This offer was rejected by Segal, who demanded cash, saying, "I will have to give the mother and father something. They are here now." Adler gave Segal $100 in cash. Defendant admits that, when he received this $100, he was "around the corner from the hospital." Two days later, in Philadelphia, Adler paid Segal the remaining $400 in cash.
Segal testified that he paid Mr. De Jesus $20 in the vicinity of the hospital on the day the baby was released from the hospital and turned over to the Adlers. Defendant stated that he gave this money to the father to pay the hospital bill, but he did not know whether this money was actually used for that purpose. Another $80 was given to Mr. De Jesus the next day to pay the hospital, although the testimony does not disclose where this payment took place. Again, defendant did not know whether the money was actually used to defray the hospital expenses, although this was the purpose for which he allegedly gave the money to Mr. De Jesus.
Segal further testified that, soon after his payments to Mr. De Jesus, "I sent $100 to the attorney in the adoption proceeding." Thus, Segal retained a balance of $420 from the $1,000 paid to him by the Adlers. Segal testified that the $580 had been disbursed as follows: $380 for weekly payments to Mrs. De Jesus, $100 to Mr. De Jesus and $100 for the attorney's fee. Segal retained the balance of $420 because "I was expecting a hospital bill and a doctor's bill and I didn't know whether I was going to pay the additional sum of money to the attorney for the adoption or not * * *."
John F. Hannah, who had "full charge of the bookkeeping and any and all obligations due to the [Cooper] hospital," testified that his records indicated that Mrs. De Jesus' original bill was $97.54. A payment of $1 had been made in May 1961 "leaving a balance due of $96.54," which was still unpaid at the time he testified.
*280 Several weeks after placing the baby with the Adlers, Mrs. De Jesus telephoned to Segal and said she wanted her child returned because "my husband misses it." Segal testified that he was "shocked and surprised because of my past experience with her [Mrs. De Jesus]." He replied, "Gee, I can't give it back to you  the baby's been adopted." Mrs. De Jesus consulted an attorney, who in turn notified Segal of the mother's desire to have Perry returned. Eventually, the child was returned to Mrs. De Jesus by the police. Mr. Adler demanded that Segal return the $1,000; but, about three months after the child had been returned to his mother, Adler received only $500.
On this appeal defendant argues that N.J.S. 2A:96-7 is unconstitutional, that New Jersey lacks jurisdiction to try him, that his motions for judgment of acquittal should have been granted, that the verdict was against the weight of the evidence, and, finally, that error was committed in the trial judge's charge. We will consider the contentions in that order.
Defendant alleges that N.J.S. 2A:96-7 is unconstitutional because it is vague and does not sufficiently inform him of the behavior interdicted. Preliminarily, we emphasize that if a statute is reasonably appropriate in its over-all approach, it should be upheld notwithstanding its possible invalidity when applied in special circumstances or fringe areas. State v. Monteleone, 36 N.J. 93, 99 (1961). The requirement is "a reasonable degree of certainty," and one willfully operating in the penumbra of a forbidden mode of behavior necessarily takes the risk that he may cross the line of illegality. State v. Joas, 34 N.J. 179, 186 (1961). Definiteness or certainty in a criminal statute is required "to notify a person who would avoid its penalties, to guide the judge in its application, and to aid those defending one charged with its violation." State v. Congdon, 76 N.J. Super. 493, 504-5 (App. Div. 1962). This requirement is not a refuge for criminals seeking solace in alleged inadequacies of legislative drafting. In particular, defendant argues that the words "in *281 connection with" used in the statute contain a "wide spectrum of possible interpretations * * * not permissible in a criminal statute."
This court recently had occasion to uphold the constitutionality of this statute against a similar claim. State v. Wasserman, 75 N.J. Super. 480, 491 (App. Div. 1962). There the court stated that an act of the Legislature carries a strong presumption of conformity with the organic law and that mere doubts are not sufficient to negate this presumption of validity. Where a statute is capable of two possible constructions, that which can be held constitutional will be adopted. See State v. Monroe, 30 N.J. 160, 165 (1959).
In Wasserman the defendant claimed to have difficulty in understanding the expressions "in any manner assist" and "anything of value." Such language was held to be clear and constitutional in its context. Similarly, in the present case the phrase "in connection with" is clear when read in its context. This phrase merely seeks to immunize innocent third parties who might pay customary medical and hospital charges in the course of an otherwise illegal adoption proceeding. The paramount legislative object is to prevent the nefarious but profitable traffic in human lives exemplified by this case.
Next, defendant alleges that this State lacks jurisdiction to try him, since the adoption arrangement was made in Philadelphia, all funds except $100 were received by defendant in Philadelphia, and this $100 "was used for or was supposed to have been used for the payment of a hospital bill here in New Jersey." In support of this argument defendant relies upon In re Fenn, 28 N.J. Super. 614 (Cty. Ct. 1953), for the proposition that criminal laws are applicable only within the confines of the enacting states. A glance at Fenn, however, clearly demonstrates its legal and factual inapplicability to the present case.
Fenn concerned a complaint of a husband and wife for leave to adopt a minor. The placement of the child was made in Pennsylvania, and the natural parents formally consented *282 to the adoption. The New Jersey Department of Institutions and Agencies protested that the adoption was illegal because the child had been placed for adoption by a Pennsylvania organization which had not been approved for adoptions in this State, and because the consent of the Commissioner of Institutions and Agencies had not been obtained, as required by N.J.S.A. 9:7-3. In granting the adoption, the trial judge noted that under the circumstances "the best interests of this child" called for ratification of the adoption "regardless of what laws may have been broken." (at p. 616)
Fenn, therefore, concerned a placement which had taken place outside of this State. The natural parents had given their formal consent in a proceeding for the formal adoption of the child. On the other hand, the instant case is a criminal prosecution involving the sale of a day-old child. The informal arrangements for the placing of the child were made with the natural parents in New Jersey. The child was born in New Jersey, transferred and placed in this State. At least $100 in cash was given by the adopting parents to the defendant in this State; he, in turn, admits giving $20 to the natural father in New Jersey. In addition, defendant further concedes sending 19 payments of $20 each in cash to the natural mother in this State. Common sense would be affronted by a finding that none of these actions "in any manner assist in the placement of a child" in violation of N.J.S. 2A:96-7.
In Fenn, the court chose to limit this State's jurisdiction "for the best interests of this child." (at p. 616) In the instant case, the interests of society in ending the unlawful trade in "black market" babies are to be protected. See State v. Wasserman, supra, 75 N.J. Super., at pp. 488-9. Here, too, the interests and welfare of children are best protected by statutory procedures and not by making them the objects of sale.
The arguments regarding defendant's motions for judgment and for reversal of judgment may be treated together, since both concern the claim of insufficiency of evidence. *283 State v. Fiorello, 36 N.J. 80, 86-91, 92-3 (1961). Despite the volume of uncontradicted evidence demonstrating his participation in the illegal placing of Perry, defendant argues that the evidence fails to demonstrate a violation of N.J.S. 2A:96-7. Defendant claims that "the heart of the matter" is the transference of money in connection with the adoption and that all the moneys which he handled were used for purposes within the exempting clause of the statute, i.e., "in connection with the birth and any illness of the child."
Defendant readily admits that he received $100 from the Adlers and $20 was paid to Mr. De Jesus in Camden. Another $80, he says, was given to Mr. De Jesus the following day. Although defendant testified that these payments were for the hospital bill, Mr. Adler testified that Segal wanted the $100 "to give the mother and father something. They are here now." Thus, defendant concededly received the $100 "around the corner from the hospital," but the hospital bill of $96.54 was never paid. While defendant says he paid $20 and then $80 to Mr. De Jesus for the purpose of paying the hospital bill, when asked what Mr. De Jesus did with the money, defendant responded, "I don't know." Then, too, defendant's statement that the $100 given to Mr. De Jesus was to pay for the hospital bill conflicts with his later statement that he was retaining a balance of $420 because "I was expecting a hospital bill." Thus, a jury question was clearly presented as to whether these payments were legitimately in connection with the birth or whether they were merely a pay-off, e.g., State v. Landeros, 20 N.J. 76, 82-3 (1955); State v. Graziani, 60 N.J. Super. 1, 13 (App. Div. 1959), affirmed 31 N.J. 538 (1960).
Defendant's final objection concerns the charge given by the court. Error is claimed because the court failed to use three of defendant's requests to charge, because allegedly improper comment was made upon the evidence, and because the court failed to charge that proof of criminal intent was necessary for conviction under the statute.
*284 The requests to charge were properly denied. The first request would have imposed an obligation upon the State to prove that defendant received the money for his own use or profit. Such a requirement is wholly absent from the statute. The second request would have exonerated defendant had he been a mere agent for the disbursement of funds; this requirement, too, cannot be found in the statute, which clearly seeks to reach any person engaged in the illegal placement of a child. The third proposed request would have allowed the jury to render a verdict of not guilty, if the evidence showed merely an unfulfilled promise of payment to defendant. Although there was evidence of promises to pay, there was also clear evidence that actual payments took place. Indeed, defendant testified unhesitantly concerning most of the transactions in question such as, for example, the $100 paid to him by the Adlers in the vicinity of the hospital. Therefore, the requested charge had no relation to the evidence.
Of course, a request to charge must be correct in law for its denial to be error. The trial court was not in error in denying the charges requested by defense counsel. State v. McNair, 59 N.J. Super. 453, 459 (App. Div. 1960).
Defendant claims error in the fact that the court, in summarizing defendant's testimony, characterized the $1,500 expenditure as a "charge"  instead of referring to it as a "cost" of adoption. Preliminarily, we note that the suggested distinction is of little substance. Furthermore, defendant failed to make timely objection. R.R. 1:5-1(a), made applicable to this court by R.R. 2:5; R.R. 3:7-8. The trial judge corrected any confusion which might have arisen from his use of the word "charge" by his repeated instruction to the jury that they were the sole judge of the facts and that any comments by the judge should be disregarded, if these comments were contrary to the jury's recollection of the facts.
Defendant also urges that the statute in question should be read to require criminal intent or scienter. Here again, timely objection was not made, nor was this point ever *285 raised by defendant at trial. In such a posture, a finding of plain error would be necessary. State v. Haines, 18 N.J. 550, 565 (1955). We find no such error in this case, for there is no implicit requirement of scienter in N.J.S. 2A:96-7.
It is axiomatic that the Legislature can "designate the mere doing of an act as a crime, even in the absence of the mens rea which was a necessary prerequisite at common law." Morss v. Forbes, 24 N.J. 341, 358 (1957). "Where words clearly indicating the requirement of a criminal intent are omitted, the issue becomes one of statutory construction to ascertain the meaning of the legislative body." Ibid. See State v. Tracy, 29 N.J. Super. 145, 152 (App. Div. 1953), affirmed 15 N.J. 79 (1954). This court has already found that in adopting N.J.S. 2A:96-7 the Legislature intended to prohibit any person from engaging in the illegal placing of a child for adoption "no matter how innocent or well meaning they may be," where the child has not been approved for that purpose by the Department of Institutions and Agencies. State v. Wasserman, supra, 75 N.J. Super., at p. 488.
In upholding the validity of R.S. 2:202-16 (now N.J.S. 2A:170-18), which makes the possession of lottery slips a violation of the disorderly persons act, our Supreme Court in State v. Labato, 7 N.J. 137, 150 (1951), stated that "[t]he criminal mind is not essential where the Legislature has so willed. The doer of the act may be liable criminally even though he does not know the act is criminal and does not purpose to transgress the law." (at pp. 149-50) Thus, in the present case, although defendant might possibly have been unaware that his actions were in violation of the law of this State, he certainly knew that he was taking steps to procure an adoption.
Defendant cites State v. Hudson County News Co., 35 N.J. 284, 294 (1961), in support of his argument that "a guilty mind has normally been a prerequisite for the conviction of a crime." That case concerned a violation under N.J.S. 2A:115-2 for selling and distributing obscene publications. *286 That statute expressly requires intent. In addition, it deals with the area of First Amendment freedoms; and, as the opinion emphasized, scienter is required under these circumstances by the firm holding of the United States Supreme Court. See Smith v. People of the State of California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).
Affirmed.