162 N.J. Super. 587 (1978)
394 A.2d 120
IN THE MATTER OF THE ADOPTION OF A CHILD BY I.T. AND K.T., HIS WIFE.
Superior Court of New Jersey, Hudson County Court, Probate Division.
September 25, 1978.
*588 Mr. Edward Terner for plaintiffs.
YOUNG, J.C.C.
The issue presented in this adoption proceeding is whether the circumstances of the private placement of the child constituted an illegal act and should be set aside on grounds of invalidity. The circumstances *589 in this unregulated placement are highly suggestive of the so-called black and gray market in babies. The evidence to be reviewed, and the determinations to be made are framed by the provisions of the Adoption Act of 1953 and the decisional law interpreting that legislative scheme. That legislation mandates a preliminary hearing when an infant has not been received into plaintiffs' home under the supervision of an "approved agency" as defined by N.J.S.A. 9:3-18(a). N.J.S.A. 9:3-23A(4).
A complaint was filed October 19, 1977, followed by an amended complaint, sworn to November 8, 1977. The latter pleading is a printed form with spaces for averments to be filled in. Following the recitals which identify plaintiffs, the pleading alleges that the child to be adopted is Baby Boy R, who was born September 22, 1977 in Tucson, Arizona.[1] The amended complaint further avers that plaintiffs have one other child, J, born July 27, 1973 in Tucson, Arizona; plaintiffs received the child to be adopted from the natural mother, and are not related to the child; the child came under the care of plaintiffs on September 26, 1977 and has continued to the date of commencement of this action; the natural mother of the child is B.R., who resides at Oracle, Arizona, and who is not married to the natural father of the child; plaintiffs are citizens of the United States; the child to be adopted has no property; the intended name of the child is M.T.; the occupations of plaintiffs are housewife for K.T. and "tax shelter sales" for I.T.
There is annexed to the pleading a document which purports to set forth the consent of the natural mother to the adoption, notarized and reflecting the signature of two witnesses in lieu of an acknowledgment as sanctioned by Arizona law. A.R.S.A. 8-107(A). Reference will be made presently to the validity of the instrument to achieve *590 its intended effect of conferring consent to adoption, and waiver of notice.
Judge Gilmore, J.J.D.R.C. t/a, entered an order for preliminary hearing dated December 5, 1977. The recitals of that order followed the provisions of N.J.S.A. 9:3-23 in that it declared the child to be a ward of the court; that the custody of the child shall be subject to the further order of this court, and that the Division of Youth and Family Services shall make an investigation and report concerning (a) the circumstances under which the child was received in plaintiffs' home, (b) the status of the parents of the child, (c) the potential fitness of the child for adoption and (d) the potential fitness of plaintiffs to adopt the child. It was further ordered that the notice of preliminary hearing, scheduled for January 13, 1978, "shall either be given personally to the natural mother as provided by the statute within 30 days of the date hereto, or notice waived by her." The attorney's inclusion of the waiver of notice provision will be the subject of comment.
In addition to the scope of the preliminary hearing here outlined, another purpose thereof is to determine whether a natural parent should have "[any] further right of custody of the child." N.J.S.A. 9:3-24C; In re Adoption of Children by D., 61 N.J. 89, 94 (1972). As stated by the Supreme Court in the most recent decision on the subject, "In effect, the termination of the rights of the natural parent is a condition precedent which must be met before an adoption can proceed to finality." Sees v. Baber, 74 N.J. 201, 210 (1977).
The initial report of the Division of Youth and Family Services, filed January 10, 1978, related that the child, Baby Boy R, was born in Tucson, Arizona, on September 22, 1977, to a 16-year-old unwed mother, B.R., then residing at Oracle, Arizona. It appears that an attorney in Tucson, J.A.E., acted as an intermediary in planning the placement of the infant prior to birth. The attorney enlisted an unnamed "friend" to physically take the child on September *591 26, 1977, four days after birth, from Arizona to J.F. Kennedy International Airport, New York, where the waiting plaintiffs took custody of the child. The initial report recites payments by plaintiffs totalling $5,074, as follows: $600 for air fare, hotel expenses for "a friend of the attorney"; $1,890 for hospital and "medical fees"; $84 for "miscellaneous items such as clothes, telephone calls, birth certificate"; $2,500 for "legal expenses" not otherwise explained. No information was supplied relating to the natural father.
The source of this information was plaintiffs, who are K.T., 30, with two years of college training and experience as a dental assistant and secretary, and her husband, I.T., 33, who holds bachelor's and master's degrees in accounting and finance. Mr. T. has been a securities analyst, co-owner of a manufacturing establishment in needle crafts, and presently the principal of a firm which renders financial services specifically in the tax shelter field. I.T. testified to annual earnings "in excess of $50,000."
At the preliminary hearing, January 13, 1978, it was disclosed that Baby Boy R is the second child acquired by plaintiffs via the efforts of J.A.E. in Tucson. The modus operandi by which plaintiffs obtained custody of a female child in 1973 were in many respects similar to the manner in which custody was obtained of the child now a ward of this court. A judgment of adoption of the female child was entered in the Bergen County Court October 2, 1974. During those years an investigation was conducted by the office of the prosecutor of Bergen County, ranging to many parts of the United States, probing the activity known as black market in babies. That inquiry culminated in the return on September 9, 1976 of four separate indictments against counsel for plaintiffs.[2] The trial on those indictments *592 is scheduled for the September 1978 Term. Sometime after the adoption proceedings in Bergen County plaintiffs herein moved to Hudson County.
This court, not satisfied with the scope of the initial investigation, requested the Division of Youth and Family Services to expand its inquiry and to enlist the cooperation of the Division's counterpart in Phoenix, Arizona. The Division submitted an "Addendum to the Preliminary Report," dated May 31, 1978, the delay attributed to a bureaucratic error in Arizona in routing the letter to the appropriate county. Again, as in the preliminary report, most of the contents were supplied by plaintiffs themselves. Plaintiffs related that they learned of J.A.E., the attorney-intermediary in Tucson, through plaintiff's brother who "had a friend in Arizona whose wife had gone to high school with him." J.A.E. would phone plaintiffs to relate that "a client of his was pregnant and wanted to place her child for adoption." Plaintiffs went by air to the Tucson Medical Center and brought the female child to New Jersey. The circumstances of the placement now under review are said to have their origin in a telephone call by J.A.E. to plaintiffs on July 27, 1977, when he related that he had another pregnant client who wanted to give up her child. The only precondition imposed by plaintiffs was that the child yet to be born be free from physical defects. J.A.E. *593 telephoned plaintiffs on September 23, 1977, advising that a male child in apparent good health was born to his client on the day before.
The agency's report notes that because of "reservations about finances," plaintiffs did not travel to Tucson. Instead, J.A.E. enlisted "a family friend, Mrs. S.K.," to bring the baby boy to J.F. Kennedy International Airport, New York, on September 26, four days following the child's birth. The report quotes plaintiffs as saying that they gave Mrs. K. no financial reimbursement.
Plaintiffs admit to financial payments here summarized: to Edward Terner, counsel herein, fees of $1,030; hospital expenses attending the confinement, $1,206.25 (which includes charges for an earlier admission for false labor); physician's fees and lab charges, $692; air fare and hotel charges for Mrs. K., $600; miscellaneous, including telephone charges, clothing for the infant, birth certificate, $84; and "attorney's fees" of $2,500 to J.A.E. in Tucson, Arizona.
During the months of March and April the court pressed the Division of Youth and Family Services to obtain additional information, with special reference to the natural mother. By letter of transmittal dated April 25, 1978 that agency provided a photocopy of what purports to be an affidavit executed by the natural mother. The instrument bears the printed name and address of a law firm, L., K. & H., Tucson, and recites in relevant part:
That she is the mother of an infant boy, born in Tucson, Arizona, on September 22, 1977. That your affiant determined that it would be in the best interests of the child if the child be placed for adoption and that your affiant, with the assistance of her physician and relatives, obtained the services of attorney, M.J.G., to arrange for the placement of said child for adoption. That your affiant is fully aware that the child has been placed for adoption and that the adoption of the child has been and is now your affiant's desire.
*594 Mr. G., a member of the law firm aforementioned, states in his letter to the Division of Youth and Family Services that he prepared the affidavit and forwarded it to the mother through her aunt and uncle "here in Arizona." The affidavit reflects the County of Pennington, State of South Dakota, and bears no acknowledgment.
Counsel for plaintiffs concedes, for the purposes of this proceeding, that J.A.E. is not licensed to place children for adoption in the State of New Jersey. Presumably, the same concession would extend to Mrs. S.K., who was enlisted by the Arizona attorney to transport the infant from Arizona to the airport in New York City.
At the outset the court will dispose of the effect of the two purported affidavits assertedly executed by the natural mother. A reading of both documents leads to the conclusion that they are the handiwork of skillful draftsmen, with the overriding design to make the proceedings impervious to attack. They are what may be called "affidavits of adhesion." The scrivener of the affidavit annexed to the amended complaint made sure that, among other things, the natural mother waived one of her rights of due process, namely, notice of these proceedings. As for the document submitted by Mr. G., who included a description of himself as attorney of the natural mother, it is admitted that he drafted the contents in his office in Arizona and, through relatives of the natural mother, had it executed in South Dakota. Significantly, that document recites that the physician of the natural mother was enlisted along with the attorney "to arrange for the placement of said child for adoption."
Mr. G. apparently acted with J.A.E., for the reason that the affidavit annexed to the amended complaint purportedly executed by the natural mother reflects the signature in full of "M.J.G." as one of two witnesses. As for the second affidavit executed in South Dakota, it is significant to note that the statutes of that state require for adoption proceedings there that "the other persons whose consent is necessary must appear before the court and the necessary consent must *595 thereupon be signed and an agreement be executed by the person adopting, and filed by the court, * * *." S.D.C.L. 25:6-12.
The aspect of consent, however, is directly disposed of by the recent decision in Sees v. Baber, supra, in which the Supreme Court held that
Only where an adoption proceeds on the basis of a placement with an approved agency may consent and surrender become a statutory basis for terminating parental rights. A surrender of the custody of a child is not valid unless made to an approved agency. N.J.S.A. 9:2-14. [74 N.J. at 212]
Consequently, a consent and surrender does not work a forfeiture of parental rights in private placements. When such is the finding, the adoption cannot proceed to finality. Id. at 210; see In re Adoption of J., 139 N.J. Super. 533, 538-539 (App. Div. 1976), rev'd on other grounds on dissent below. 73 N.J. 68 (1977); In re Adoption of R.D., 127 N.J. Super. 311 (App. Div. 1974), certif. den. 65 N.J. 292 (1974).
This determination does not entirely dispose of the matter. Any reopening of the proceedings to determine whether the natural parents have "forsaken parental obligations" must await a determination of the issue posed at the outset of this opinion, namely, did the private placement of the child constitute an illegal act and should it be set aside on the grounds of invalidity. For to question whether the natural mother has forsaken parental obligations would shift the focus of the inquiry at this point away from the legal and ethical quality of plaintiffs' conduct, parties who seek a privilege from this court. See In re Adoption of E, 112 N.J. Super. 326 (Cty. Ct. 1970), rev'd on other grounds 59 N.J. 36 (1971). Assuming, arguendo, a determination that the natural mother has forsaken parental rights, would such a judgment enhance in any way the standing of plaintiffs or their entitlement to a judgment? The drawing of comparisons to the conduct of others, however odious or *596 favorable in balance, cannot supply deficiencies from a failure to comply with the statutory scheme for adoption. The right of adoption exists solely by statute to which the courts exact strict compliance. In re Adoption of A, 118 N.J. Super. 180 (Cty. Ct. 1972). It is to that central issue to which this court now turns.
The Supreme Court has noted that the private direct placement of children for adoption "is very much disfavored," for the reason that "The thrust of the legislative approach is to encourage adoptions through approved agencies." Sees v. Baber, supra 74 N.J. at 217, citing Lavigne v. Family & Children's Soc. of Elizabeth, 11 N.J. 473, 482 (1953). In Sees v. Baber the Supreme Court had occasion to discuss the statutes in the criminal code together with the statute which pertains to the civil aspects of the placement of children for adoption.
Under our statutes, criminal sanctions may be invoked against a
person who places, offers to place or in any manner assists in the placement of a child in a home of another for purposes of adoption unless the adoptive person is a brother, sister, aunt, uncle, grand-parent or step-parent of the child. N.J.S.A. 2A:96-6 and 7. A parallel provision in the adoption act itself prohibits such private placements by unauthorized individuals. N.J.S.A. 9:3-19. [74 N.J. at 217]
The court then noted the rationale of the criminal and civil statutes:
The legislative onus upon this conduct is intended to inhibit the private direct placements of children for adoption, other than with close relatives, in order to extinguish the nefarious practices associated with the so-called black and grey market in babies. [Ibid.]
Earlier, the Appellate Division had occasion to interpret and to apply the same statutes in State v. Wasserman, 75 N.J. Super. 480, 488 (1962), aff'd o.b. 39 N.J. 516 (1963), *597 the results of such review summarized in the excerpt here quoted:
In making such an examination we find it to be clearly revealed that a unified, coherent system for the legal adoption of children was contemplated, and that public policy demanded a liberal construction of such laws to the end that all placements of children for adoption, other than with close relatives, should be prohibited to any person, corporation, agency or party (`no matter how innocent or well meaning they may be' including `the ministers, the doctors and well-wishers, those who want to save a home or embarrassment by direct dealings') which has not been approved for that purpose by the Department of Institutions and Agencies. A paramount and dominant objective was to prevent the trafficking for profit in human lives and to extinguish from our society the so-called `black market' and `gray market' in babies. [at 488-489]
The benefits of exclusively state-approved agency participation were noted by the Appellate Division:
These are salutary benefits which inure to the transacting parties, and include the protection of (1) the natural parents from the consequences of a hasty decision made under distressing circumstances, (2) the prospective or adopting parents by ascertainment of their qualifications and furnishing information respecting the physical, mental and other characteristics of the child, and (3) most important of all, the child's best interest and welfare. [Id. at 489]
In its final report to this court, August 11, 1978, the Division of Youth and Family Services conceded that "there may have been irregularities related to this placement."[3] The testimony of plaintiffs, together with the reports of the Division, establish that both the attorney in Arizona, J.A.E., and Mrs. S.K. were involved in making arrangements to place the child even before its birth and assisted in placing the child in New Jersey. A second attorney, M.J.G. in Arizona, also had a role in the surrender from the natural *598 mother. The natural mother never met plaintiffs. It is conceded that attorney J.A.E. is not licensed to place children, and from all that appears, none of the other participants is so licensed. It is the finding of this court that J.A.E. is in violation of our statutes, N.J.S.A. 2A:96-6 and 7.
Plaintiffs have admitted paying J.A.E. the sum of $2,500, which they described as "legal fees." With that admission the payment falls under the prohibition of N.J.S.A. 2A:96-7, which reads in its entirety as follows:

2A:96-7 Placing of children for adoption; other than by approved agency, for consideration forbidden; exception
No person, including a natural parent or parent by adoption, and no firm, corporation, association or agency, other than an agency approved to place children for adoption as provided by law, shall place, offer to place, or in any manner assist in the placement of a child in the home of any other person or persons for the purpose of adoption and, in so doing, take, receive or pay any money or anything of value, or undertake or discharge any financial obligations, except in connection with the birth and any illness of the child. Any person, including a natural parent or parent by adoption, or any firm, corporation, association or agency, other than an agency approved to place children for adoption as provided by law, violating this section, shall be guilty of a high misdemeanor. [Emphasis supplied]
There is no evidence that J.A.E. performed any "legal services" on behalf of plaintiffs except perhaps the drafting of an affidavit accompanying the surrender. It is the conclusion of this court, in the totality of the circumstances, that the payment of $2,500, admitted to by plaintiffs, represented "broker's or finder's commissions." The facts submitted spell out a classic black market transaction, following the recurring pattern described in a recent study, Baker: Baby Selling: The Scandal of Black-Market Adoption (1978), especially chapter 4, "The Baby Brokers," at 67-115. See also, Turano, "Black Market Adoptions," 22 The Catholic Lawyer 48 (Winter 1976). J.A.E. played the role of the nonlicensed intermediary who was the liaison *599 between the natural mother and the adoptive parents. His methods followed the usual course down to the $2,500 "legal fee" frequently noted in such cases. See Baker, op. cit., at 110.
Plaintiffs played the role of willing accomplices in the conspiracy, including the giving of testimony which has the effect of shielding their New Jersey counsel, Edward Terner, from culpable involvement. This conclusion is drawn from plaintiffs' studied assertions to the caseworker for the Division of Youth and Family Services, that they did not engage Terner until the child was already in their custody. Plaintiffs volunteered information designed to exclude their counsel as an active participant in the placement. It was noteworthy to this court, having presided over adoption proceedings for seven years, to observe and listen to laymen fashion their testimony as in this matter. A trial court is entitled to consider so-called "demeanor evidence" and the special "feel of the case" which are derived from presiding, Dolson v. Anastasia, 55 N.J. 2, 6 (1969).
At the preliminary hearing counsel was confronted with the strictures of N.J.S.A. 9:3-19, subsec. (A), which provide that
No person, firm, corporation, association or agency shall place, offer to place, or assist in the placement of any child in New Jersey for the purposes of adoption, unless such person, firm, corporation, association or agency shall be the natural or adopting parent of the child or shall have been approved for such purposes by the Department of Institutions and Agencies.
In response, counsel points to the "consent" of the natural mother an argument already disposed of in this opinion, but places greater emphasis upon his contention that the placement in New Jersey was by the adopting parent, a stated exception in the statute. Counsel's legal position is reflected in the excerpts which follow from the preliminary hearing:
MR. TERNER: The restriction in the statute, in the Title 9, is the placement of the child in New Jersey. Now, if they receive a *600 child, wherever they receive a child, if they receive a child in California or Arizona or any other state, and then bring it into New Jersey, it may be a concern of that particular state whether it was legal there or not.
But, in any event, what we are concerned here in New Jersey is what has happened in New Jersey. And the only facts that we have here in this case is that the child in New Jersey was brought into New Jersey by the plaintiffs, and 
THE COURT: It wasn't brought in by the plaintiffs. They met the child at an airport.
MR. TERNER: Outside of the state, in New York, and then they brought the child into New Jersey. The only time that this child was brought into New Jersey was in the company of the plaintiffs. And the statute says placement in New Jersey. It still doesn't restrict  . (Tr. 18:17  19:11.)

* * * * * * * *
If he came into New Jersey and endeavored to place a child here, that's different. He is violating New Jersey law. No more so than any action created outside the physical boundaries of the State of New Jersey could be subject to New Jersey law.
Counsel cites in his letter memorandum as his sole authority for his legal position In re Fenn, 28 N.J. Super. 614 (Cty. Ct. 1953).
Counsel's legal argument is undercut not only by reference to the record but by the decisional law of this State. As to the former, the sworn statement of plaintiffs, annexed to the amended complaint, recites, in relevant part: "We received the child in the State of New Jersey, the child having been brought to us by arrangements made by the natural mother with the Arizona attorney." The legal argument was rejected in State v. Segal, 78 N.J. Super. 273 (App. Div. 1963), in which it was held that even where adoption arrangements were made in another state, New Jersey had jurisdiction to prosecute for violation of N.J.S.A. 2A:96-7. In Segal, as here, reliance was placed on In re Fenn, supra, but Judge Freund, writing for the Appellate Division, held that reliance to have been misplaced. In Fenn the placement had been made in Pennsylvania, by an agency in Wyoming County, licensed by that Commonwealth to place children for adoption. It follows that such *601 a placement was accompanied by all of the safeguards attendant thereto. Additionally, the natural parents had given their formal consent in a judicial proceeding of formal adoption of their child. In a paragraph most relevant to the matter before this court, Judge Freund wrote:
In Fenn, the court chose to limit this State's jurisdiction "for the best interests of this child." (28 N.J. Super. at p. 616) In the instant case, the interests of society in ending the unlawful trade in "black market" babies are to be protected. See State v. Wasserman, supra, 75 N.J. Super. at pp. 488-9. Here, too, the interests and welfare of children are best protected by statutory procedures and not by making them the objects of sale. [State v. Segal, supra, at 282]
The record supports findings that plaintiffs herein negotiated from this State with J.A.E. of Tucson, Arizona, who is unlicensed to place children for adoption; that they remitted treasurer's checks and personal checks from this State to J.A.E. for purposes not contemplated by N.J.S.A. 2A:96-7; that by their own admission they "received the child in the State of New Jersey." Common sense would be affronted by a finding that none of these actions "in any manner assist in the placement of a child" in violation of N.J.S.A. 2A:96-7. This court finds that the provisions of the statute cited have been violated. It is the determination of this court that the private unregulated placement of the child constituted an illegal act and is set aside on grounds of invalidity.
The adoption matter having been declared aborted, there remains the question of custody of the infant. The Division of Youth and Family Services, in its last report dated August 11, 1978, suggests that the child's custody should remain with plaintiffs, notwithstanding recognition of "apparent illegality" disclosed by its investigation which also leads it to recommend that the court refer the matter to the prosecutor of Hudson County.
Counsel for plaintiffs suggests in his letter memorandum that "it is the general practice" for the trial court to approve *602 the adoption "notwithstanding an unauthorized placement," citing In re Fenn, supra. Counsel concludes with the statement: "The plaintiffs are excellent parents, completely attached to the child and the best interests of the child should be our prime concern."
All too often when the principle of "best interests of the child" is urged upon a court it is calculated to preserve the status quo and intended to end the matter. Such a reflexive response would demand abdication by the court of its mandate to exact compliance with the legislative scheme. The application of the principle calls for an agonizing reconciliation of competing interests and values. That is why the suggestion of the state agency is too facile an alternative. In the first place, it casts aside the rights outstanding of the biological parents which have not been extinguished by judicial decree. In the second place, it fails to take account of the interests of society in eliminating the free enterprise market in babies.
Our Supreme Court has noted that the best interests of the child standard is a flexible one, leaving a great deal of discretion to the trial judge  discretion which must be reasonably exercised by reference to the record and to the trial judge's opportunity to observe the applicants and their witnesses. In re Adoption of E., 59 N.J. 36, 49-50 (1971). In the same sentence in which Justice Handler recognized that "the welfare of the child remains the paramount and overriding concern," there was also a recognition that "all of the interests staked out in various provisions of the adoption statute, including those of the natural and adoptive parents, should be considered in pari materia." Sees v. Baber, supra 74 N.J. at 223. The "interests" referred to encompass those of society in suppressing the commerce in babies, which interests the Legislature has sought to protect by enacting N.J.S.A. 2A:96-6 and 7, which must be considered in pari materia with the Adoption Act of 1953, N.J.S.A. 9:3-17 et seq. In the present matter the child has been in the custody of plaintiffs just one year, the same *603 period of time that the child was with the adoptive parents in Sees v. Baber. The Supreme Court dispensed with any further hearing addressed to the impact of a change in custody from the adopting parents to the natural mother. The court mentioned that it would expect testimony would be received at such a hearing to support the thesis that some risk of emotional harm would ensue from a transfer. The conclusion of the court on this question is here quoted:
The insuperable difficulty, however, is that the nature and duration of such psychological damage are imponderable, at least where an infant is involved. There is simply no firm basis to conclude that an inquiry focusing upon the existence of `psychological parenthood,' in a case such as this, with an infant just one year old, would be at all helpful or productive in deciding whether that child could not now be raised adequately and decently by his own mother without ruinous psychological trauma. That far truth is still beyond our ken. [Citing Okpaku, "Psychology in Child Custody Cases," 29 Rutgers L. Rev. 117 (1976) and other authors.] [74 N.J. at 222]
Indeed, while it is true that the child would have to make an adjustment to removal from plaintiffs, recent studies of adoption show that children much older than Baby R adjust successfully to a favorable, though new, environment.[4]
Plaintiffs did not act out of ignorance. They had acquired custody of a child earlier from the same intermediary in Arizona. Surely, they were aware from reports in the media of the probe in Bergen County which exposed an apparent black market in babies and culminated in the return of indictments against their own counsel for alleged complicity therein. It is reasonable to conclude that plaintiff, Mr. T., with a master's degree and self-employed in the sophisticated world of finance, was aware of the risks when he collaborated with the intermediary in Arizona. Plaintiffs paid the demanded tariffs. They qualify financially and culturally, *604 but they do not qualify legally. Their counsel had a duty to warn them from the beginning that their hold on the child was precarious.
The private placement was arranged by attorneys and no one had the duty or function of considering, prior to the child's placement and the filing of the complaint, whether the adoption was to the child's interest as distinguished from that of plaintiffs'. Thus, with no one representing the child's interest or welfare, the exercise of the State's power of parens patriae is obligatory.
Only in the implementation of the clearly stated policy of the Legislature does there lie a real opportunity of inhibiting and suppressing the opprobrious black market in children. The reasoning of Judge Freund, in affirming a conviction for the unlawful placing of a child for adoption, bears repeating: "Here, too, the interests and welfare of children are best protected by statutory procedures and not by making them the objects of sale." State v. Segal, supra, 78 N.J. Super. at 282. Judicial implementation of that policy will advance the welfare of Baby R and all other infants who may become separated from their natural parents by irregular practices. Implementation will also protect the natural mother of Baby R whose parental rights are still outstanding. Her absence from this court is all the more reason why the court should lend every effort to safeguard her interests in her offspring.
Implementation will also safeguard the usually forgotten victims of black market adoptions, the large number of would-be adoptive parents. Hundreds of couples are required to wait four years or more for an agency placement, unwilling to lend themselves to this kind of transaction. Why should a court lend its aid to endorse an illegal placement which enables a couple to go to the head of the line by circumventing the law?
Finally, implementation of the public policy will safeguard the integrity of the judicial system, the final victim of baby-selling.
*605 In a "gray market" placement the Family Court of New York disapproved the adoption of a four-month-old child because the attorney-intermediary was not authorized to place children. Citing mandatory statutory guidelines, the court ordered the child returned to his mother, who testified,[5] "or surrendered to an authorized agency." In the Matter of Anonymous, 46 Misc.2d 928, 261 N.Y.S.2d 439 (1965). The possibility that a New Jersey court would similarly rule was noted in a recent criminal action arising from illegal placement. People v. Rosenstein, 92 Misc.2d 1069, 1074, 402 N.Y.S.2d 151, 154 (Sup. Ct. 1978).
On the authorities cited and reasoning set forth it is ordered that the action shall be dismissed. It is further ordered that custody of the child shall be transferred to the Division of Youth and Family Services, Department of Human Services, with view to restoration of custody to the natural parents or placement according to law. In adopting the recommendation of the Division of Youth and Family Services, it is ordered that the matter be referred to the prosecutor of Hudson County with authorization to the agency to release information to that official.
The order to be entered shall be deemed final for the purposes of appeal.
NOTES
[1] The names of the infant, of plaintiffs, and of out-of-state counsel have been substituted by initials throughout this opinion.
[2] The four separate indictments were returned against Edward Terner and other defendants (Ind. Nos. S-1084-76, S-1085-76, S-1086-76, and S-1087-76). The indictments generally allege violations of N.J.S.A. 2A:96-6 and 7, relating to illegal private placements of children for adoptions, and allege conspiracies relating thereto in violation of N.J.S.A. 2A:98-1 and 2, as well as obstruction of justice. N.J.S.A. 2A:85-1.

A reading of the indictments discloses allegations that infants were procured for the purposes of adoption from Los Angeles, California, Detroit, Michigan, and Chicago, Illinois, for illegal placements with couples in New Jersey. The various counts also allege, respectively, that certain named defendants did unlawfully take and receive money in the amounts of $5,500, $4,800, $750, $8,000, $3,500, $7,000 and $8,400, in connection with the placements.
Certain counts allege that Edward Terner directed his clients, the adopting parents, to submit false information to the court in processing the respective adoptions.
[3] Copies of the agency's reports were supplied to plaintiffs' counsel contemporaneously with mailing to the court.
[4] Jaffee and Fanshel, How They Fared in Adoption, 307 ff. (1970); Kadushin, Adopting Older Children (1970), passim.
[5] The report does not reveal whether the mother petitioned for the return of her child.