164 N.J. Super. 476 (1978)
397 A.2d 341
IN THE MATTER OF THE ADOPTION OF A CHILD BY I.T. AND K.T., HIS WIFE, PLAINTIFFS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 28, 1978.
Decided December 14, 1978.
*479 Before Judges LORA, MICHELS and LARNER.
Mr. Albert G. Besser argued the cause for appellants (Messrs. Hannoch, Weisman, Stern & Besser, attorneys).
Ms. Brenda Talbot Lewis, Deputy Attorney General, argued the cause for New Jersey Division of Youth and Family Services (Mr. John J. Degnan, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
Mr. George Warren, guardian ad litem, argued the cause pro se.
The opinion of the court was delivered by LARNER, J.A.D.
This is an appeal by prospective adoptive parents from the dismissal of a complaint for adoption at a preliminary hearing held pursuant to N.J.S.A. 9:3-24. The order of the trial court dismissed the complaint and directed plaintiffs to surrender custody of the child to the Division of Youth and Family Services (DYFS). We granted a stay of this order, appointed George Warren as guardian ad litem for the infant and accelerated the appeal in order to resolve the status of the child as soon as possible.
The important question posed by this appeal is whether the participation of prospective adoptive parents in the illegal placement of a child suffices as a basis for rejecting an adoption where the record fully supports the conclusion that such adoption would be in the best interests of the child. The lengthy opinion of the trial judge, reported at 162 N.J. Super. 587, is focused upon the conclusion that plaintiffs participated in obtaining the child from another state in violation of the letter and spirit of the policy expressed by the Legislature in the statutes framed to prevent and discourage *480 the "black" and "gray" market in babies. See N.J.S.A. 9:3-19; N.J.S.A. 2A:96-6; N.J.S.A. 2A:96-7.[1]
[1] This case is controlled by the provisions if the 1953 Adoption Act (N.J.S.A. 9:3-17 to 36) and not by N.J.S.A. 9:3-37 to 56, adopted in 1977 which repealed the act of 1953.
As a consequence of this finding, he concluded:
Only in the implementation of the clearly stated policy of the Legislature does there lie a real opportunity of inhibiting and suppressing the opprobrious black market in children. * * * Judicial implementation of that policy will advance the welfare of Baby R and all other infants who may become separated from their natural parents by irregular practices. * * *
Implementation will also safeguard the usually forgotton victims of black market adoptions, the large number of would-be adoptive parents. Hundreds of couples are required to wait four years or more for an agency placement, unwilling to lend themselves to this kind of transaction. Why should a court lend its aid to endorse an illegal placement which enables a couple to go to the head of the line by circumventing the law?
Finally, implementation of the public policy will safeguard the integrity of the judicial system, the final victim of baby-selling.
It is evident from the record and the reports and recommendation of DYFS that plaintiffs are eminently qualified to undertake parenthood of the child and that it is to the best interests of the child that he remain in their custody for ultimate adoption. It is equally evident, therefore, that the sole ground upon which the judge rested his dismissal of the complaint was the impropriety inherent in the means and method by which plaintiffs obtained the child for placement in their home.
Furthermore, this litigation is unusual in that it lacks the characteristics of the normal adversary proceeding. In the trial court, plaintiffs and DYFS urged that the criteria of N.J.S.A. 9:3-25 had been fully met and that an order was warranted setting a date for final hearing in accordance with the statutory scheme of the Adoption Act. The judge acted sua sponte in denying relief. Similarly, in this court, *481 the appeal is uncontested since counsel for plaintiffs, counsel for DYFS and the appointed guardian ad litem all take the position that the trial judge erred and that the order of dismissal should be reversed.
A brief review of the factual complex underlying the placement of the child is appropriate.
I.T. and K.T. were married in 1969. In 1973, when they realized that they were unable to have children of their own, they explored the possibility of adopting a child. As a result of referral by friends they contacted J.E., an attorney of Tucson, Arizona, and advised him of their interest in adopting a child. Sometime thereafter J.E. advised I.T. and K.T. that a client was pregnant and wished to place her child to be born for adoption. Accordingly, in July 1973, when notified of the birth, I.T. and K.T. went to Tucson and returned with a baby girl who was thereafter adopted without complications in October 1974.
After a few years the couple decided to expand their family and again contacted J.E. In July 1977 he notified I.T. and K.T. about an expectant mother who desired to arrange for the adoption of her baby. On September 23, 1977 they were notified that a baby boy had been born on the day before. Arrangements were then made for the baby to be transported by a Mrs. K., a friend of J.E., to Kennedy Airport where the baby who is the subject of this adoption proceeding was delivered to I.T. and K.T.
Shortly thereafter they retained an attorney who filed an adoption complaint in November 1977. The complaint set forth the salient facts relating to plaintiffs, the birth of the child, and the name and address of the mother, and prayed for a judgment granting adoption and changing the name of the child to M.T. Attached to this complaint was an affidavit by plaintiffs verifying the allegations of the complaint and setting forth some of the circumstances surrounding the child's placement in their home. In addition, there was attached an affidavit and consent, dated September 27, 1977, by B.R. which stated that she is the natural *482 mother of Baby Boy R, born in Tucson on September 22, 1977, that she is 16 years of age and has never been married. She further declared therein that she relinquishes all rights of whatever nature and surrenders the infant to I.T. and K.T. for the purpose of adoption, waives all notices of adoption proceedings and consents to the adoption by the couple. The document is signed by two witnesses and sworn and subscribed to before a notary public.
A supplemental affidavit of the mother, dated October 31, 1977, was also submitted which stated that she refused to disclose any information as to the putative father, together with a declaration by the parents of B.R. that they "join" in the consent dated and executed on September 27, 1977.
Pursuant to the order of the trial court, DYFS, as the approved agency, rendered a report of its investigation in December 1977, wherein it recited information relating to the child, its placement and the biographical material relating to I.T. and K.T. Included in this report was the additional information to the effect that I.T. and K.T. paid for the medical and hospital expenses incident to the birth, expenses for the round trip fare of the woman who brought the child from Tucson to New York, a $2,500 legal fee to the Tucson attorney and a $1,000 fee to the New Jersey attorney who handled the adoption, for a total expenditure of over $6,000.
After the preliminary hearing the trial judge questioned the legality of the placement and continued the matter for a supplemental report by DYFS focused upon further inquiry from the appropriate agency in Arizona. Accordingly, on May 31, 1978 DYFS submitted an addendum to its report in which it recited the background material in greater detail without any variation from its original report. However, it did present an additional affidavit obtained from the mother on April 11, 1978 in South Dakota which in part states:
3. That she is presently a high school student and has had no significant health problems in the past.

*483 4. That she is the mother of an infant boy, born in Tucson, Arizona, on September 22, 1977. That your affiant determined that it would be in the best interests of the child if the child be placed for adoption and that your affiant, with the assistance of her physician and relatives, obtained the services of attorney M.J.G. to arrange for the placement of said child for adoption.
5. That your affiant is fully aware that the child has been placed for adoption and that the adoption of the child has been and is now your affiant's desire.
Apparently a letter was forwarded by M.J.G., the attorney mentioned in the foregoing affidavit, to DYFS which stated that he prepared the affidavit in Arizona and forwarded the same to the mother in South Dakota through her aunt.
Subsequently, in response to the request of the trial judge, DYFS submitted a letter stating its position as to the adoption. This letter acknowledges that the circumstances of the placement are questionable and that the matter would be referred to the prosecutor if the judge authorized the same. Nevertheless, it pointed out:
Finally, it is the Division's belief that the child's custody in this case should remain with Mr. and Mrs. I.T., the plaintiffs. Our investigation has shown them to be loving and concerned parents who are able to provide for the child's well-being. It appears from all the information that the natural mother of the infant did want adoption for her child. As the T.'s are the only parents the child has known, any move out of this home would be detrimental and certainly not in keeping with his best interests.
We are satisfied from the uncontradicted facts in the record that the judge was warranted in concluding that plaintiffs' participation in the placement of the child through an unapproved intermediary and the payment of $2,500 to the Tucson attorney for so-called legal services presents at least a prima facie showing of a violation of the civil and criminal statutes relating to placement of children.[2]
*484 While we agree with this finding, we do not agree that plaintiffs' participation in the illegal placement, standing alone, should mandate the denial of adoption, when all other factors point to the inescapable conclusion that the best interests of the child would be promoted by that adoption. See N.J.S.A. 9:3-26C and 9:3-27C. And although the trial judge has broad discretion in evaluating the qualifications of prospective adoptive parents, such as character, morality, education, standing in the community, financial ability, age and health, in order to determine whether the adoption is in the best interests of the child, the denial on the sole ground of participation in an illegal placement represents a mistaken exercise of that discretion and constitutes legal error. See In re Adoption of E., 59 N.J. 36, 50 (1971).
We are not unmindful of the agonizing dilemma of the trial judge in seeking to enforce the legislative policy against trafficking in babies and to maintain the integrity of the judicial system by the therapeutic tool of denying an adoption tainted by prima facie illegality of placement. Nevertheless, we find no legal warrant under the controlling legislation or judicial procedents for the application of any other standard than the best interests of the child. That is the paramount test in the highly sensitive area of child adoption where the determination by the court may affect the well-being of that child for his entire life. The importation of the equitable doctrine of "clean hands" as a bar to adoption because of the placement actions of the prospective parents should play no part in the adjudicative process. The trial judge fell into error in his total focus upon the legality of the placement process and the actions of the plaintiffs rather than the criteria appropriate for the determination of an adoption application which focus upon the best interests of the child.
It is noteworthy that running through the several relevant portions of the Adoption Act is the common thread of the *485 controlling criterion of the "best interests of the child." See N.J.S.A. 9:3-22; N.J.S.A. 9:3-24; N.J.S.A. 9:3-27C. Although N.J.S.A. 9:3-24 provides that the court at a preliminary hearing shall inquire, among other matters, into "the circumstances under which the child was received into the home of the plaintiff," section D sets forth the bases for denial at a preliminary hearing as (1) absence of personal service upon each person having custody of the child, or (2) a finding that the best interests of the child would not be promoted by the adoption.
Interestingly, the 1977 Adoption Act, which was passed to tighten the regulation of adoptions and placements, and to simplify the procedures for adoption, is introduced by the statement, "This act shall be liberally construed to the end that the best interests of children shall be promoted." N.J.S.A. 9:3-37. It also reiterates the "best interests" criterion in N.J.S.A. 9:3-48(f) as follows:
If, based upon the report and the evidence presented, the court is satisfied that the best interests of the child would be promoted by the adoption, the court shall enter a judgment of adoption. If, based upon such evidence, the court is not satisfied that the best interests of the child would be promoted by the adoption, the court shall deny the adoption and make such further order concerning the custody and guardianship of the child as may be deemed proper in the circumstances.
Furthermore, in incorporating the criminal sanctions for illegal placement into the new statute (N.J.S.A. 9:3-39; N.J.S.A. 9:3-54), there is no suggestion of any modification of the "best interests" standard or the correlation between a violation of the placement provisions and the grant or denial of adoption. In fact, a new section, N.J.S.A. 9:3-55, is indicative of the legislative intent in this regard. This section requires an unrelated prospective parent to file a report prior to the hearing disclosing all the detailed facts as to the placement. And if it appears that any person may have violated the criminal provisions of the statute, the *486 court or DYFS is authorized to report the matter to the prosecutor.
Although this new act is not controlling herein, it codifies the basic premise applicable prior to its adoption, that the sanction for violation of the placement provisions of the statute is limited to that imposed by the criminal laws and should not be used as a means of destroying a relationship which may be in the best interests of the child. In the absence of a clear legislative mandate, the child's opportunity for a happy and productive life should not be frustrated solely as a means of penalizing the adoptive parents. (As to an analogous situation in a custody matter, see In re Shaheen, 127 N.J. Eq. 75, 76 (E. & A. 1940); Application of Lang, 9 A.D.2d 401, 193 N.Y.S. 2d 763 (App. Div. 1959), aff'd 7 N.Y.2d 1029, 200 N.Y.S.2d 71, 166 N.E.2d 861 (Ct. App. 1960)). By the same token, the innocent child should not be penalized for the acts of the parents if it is in the best interests of that child that the adoption should be granted. And certainly our courts can well survive this offense to their dignity when there hangs in balance the welfare of a child who cannot speak for himself.
The enforcement of the criminal laws is a matter separate and apart from the function of an adoption proceeding, and the deterrence of possible criminal sanctions must suffice as the sole remedy chosen by the Legislature. See State v. Segal, 78 N.J. Super. 273, 281-282 (App. Div. 1963); In re Penn, 28 N.J. Super. 614, 616 (Cty. Ct. 1953). The court's function, therefore, in this connection is simply to report the apparent violations to the prosecutor, as the trial judge did in this case, so that he may determine whether to invoke the criminal process. It does not extend to the function of applying the criminal laws relating to placement so as to prevent an otherwise valid adoption.[3] See, *487 e.g., In re Hershey, 45 Ohio App.2d 97, 341 N.E.2d 616 (App. Ct. 1975); "Black Market Adoptions," 22 Cath. Law. 48, 63 (1976).
It must be emphasized throughout that not only is this proceeding beyond the ambit of the criminal laws, but that it does not involve a controversy between a natural parent and prospective psychological parents in an adoption proceeding. Such was the situation in Sees v. Baber, 74 N.J. 201 (1977), where the Supreme Court ordered that the child in the custody of the adoptive parents be returned to her mother because of a finding that the mother did not forsake her parental obligations in view of the early repudiation of her formal release and consent to adoption.
Where there is an objection by a natural parent to an adoption, and a finding that the statutory prerequisite of forsaking of parental obligations has not been met, the rights of the natural parent cannot be cut off, and the adoption must be denied. See Sees v. Baber, supra 74 N.J. at 221; In re Adoption of Children by D., 61 N.J. 89, 95 (1972). On such a record the court does not even reach the element of the best interests of the child, since the termination of parental rights is a condition precedent which must be met before final adoption. Sees v. Baber, supra, 74 N.J. at 210; Sorentino v. Family & Children's Soc. of Elizabeth (I) 72 N.J. 127, 131 (1970); In re Adoption of J., 139 N.J. Super. 533, 539 (App. Div. 1976), rev'd on other grounds on dissent 73 N.J. 68 (1977). See also, N.J.S.A. 9:3-24C.
What is most enlightening, however, is the disposition of the Sorentino case by the Supreme Court. Although the court found that the mother's consent and surrender of her child was a nullity, and that the statutory prerequisite for adoption of "forsaken parental obligations" was not met, it nevertheless ordered a new hearing on the premise that the overriding interest of the child transcends all other considerations. 72 N.J. at 132. The termination of the established relationship between the child and the prospective adoptive parents was considered of such importance that the court, *488 under its parens patriae jurisdiction, was willing to overlook the failure to prove the statutory prerequisite and thus remanded the matter for a hearing to determine whether the custody transfer would create a probability of serious harm to the child.
Such a hearing was held and a factual finding made by the trial judge, who concluded that the transfer of custody to the natural mother would in fact raise the probability of serious harm to the child. See Sorentino v. Family & Children's Soc. of Elizabeth (II), 74 N.J. 313, 317, 378 A.2d 18 (1977). And in this second Sorentino opinion the court paved the way for ultimate adoption of the child involved in the extensive litigation by another remand to determine whether the natural parent in fact had forsaken parental obligations by virtue of her delays in making a claim for custody of the child.
The lesson to be learned from Sorentino I and II is that in the ultimate the interests of the child are paramount. And even if there may be a finding of invalidity of a release and surrender of custody by a natural parent, changed circumstances involving the continuous custody of the prospective adoptive parents and the potential harm to the child by termination of that relationship may suffice to warrant approval of an adoption. The polestar for the protection of the child's best interests has always been to maintain an existing relationship in a stable home environment.
The court took cognizance of this in the following excerpt from Sorentino II:
In sum, those cases in which our courts have refused to terminate parental rights have encouraged the maintenance of an existing relationship. In re Adoption of Children by D., supra; In re Mrs. M., 74 N.J. Super. 178 (App. Div. 1962); Scanlon v. Scanlon, supra [29 N.J. Super. 317]. S.M. v. S.J., 143 N.J. Super. 379 (Ch. Div. 1976). Those cases in which our courts have terminated parental rights on grounds of forsaken parental obligations have encouraged the establishment of a permanent home by protecting the child from interference from a parent with whom it has no relationship. See Lavigne v. Family and Children's Society of *489 Elizabeth, 11 N.J. 473 (1953); In re Adoption by P., 114 N.J. Super. 584 (App. Div. 1960); In re Jacques, supra [48 N.J. Super. 523] [74 N.J. at 323-324]
Applying the same principles to the facts herein there is little doubt that the removal of the child from the custody of the T's who have nurtured him for more than a year would be traumatic and harmful for his well-being in the future. A report from Dr. Richard Gardner, a qualified child psychiatrist, who observed the child and interviewed the T.'s, concludes that a change of custody of the child herein would be "psychiatrically devastating." He stated:
At 12 1/2 months of age he is acutely aware of the identity of all of the family members and has a deep-seated and loving relationship with all three of them. Removing him would, without doubt, cause serious psychiatric disorder. It would not simply be an acute shock from which he might recover in a short period of time. Even with the most loving substitute parents it is quite likely that he will suffer lifelong psychiatric disturbance from such a rupture. I am not speaking here of mildly neurotic or behaviorial problems. Rather the greatest likelihood is that he would suffer severely neurotic, borderline, and even psychotic problems. It is reasonable to state that if M. were removed from this home at this time such separation would be the greatest psychiatric trauma of his life. Removal of M. would be an unconscionable act and the psychiatric damage irreparable.
This opinion is in accord with that expressed by Goldstein, Freud and Solnit in their oft-quoted work on the subject, Beyond the Best Interests of the Child (1973). They conclude that:
Change of the caretaking person for infants and toddlers further affects the course of their emotional development. Their attachments, at these ages, are as thoroughly upset by separations as they are effectively promoted by the constant, uninterrupted presence and attention of a familiar adult. When infants and young children find themselves abandoned by the parent, they not only suffer separation distress and anxiety but also setbacks in the quality of their next attachments, which will be less trustful. Where continuity of such relationships is interrupted more than once, as happens due to multiple placements in the early *490 years, the children's emotional attachments become increasingly shallow and indiscriminate. They tend to grow up as persons who lack warmth in their contacts with fellow beings. * * *
See also, Lavigne v. Family and Children's Society of Elizabeth, 11 N.J. 473 (1953); In re P. and Wife, 114 N.J. Super. 584, 593 (App. Div. 1971); In re Jacques, 48 N.J. Super. 523, 533 (Ch. Div. 1958).
Particularly in the context of the underlying facts of this case, the best interests of the child mandate that he remain in the custody of the T.'s and that they be permitted to adopt him. The alternative posited by the judgment below is totally unacceptable since, for the sake of vindication of a statutory policy, the child would be wrested from his familiar psychological parents and environment to be placed in a foster home with unknown custodians and then in turn placed in another home for the purpose of adoption. He does not even have a natural mother who wants him or offers to accept his custody or care. It hardly requires expert opinion to determine that such an alternative involving the shuttling of the child from home to home is unthinkable. So long as the interests of the child control, it is obvious that those interests are best served by a continuation of the existing relationship with the T.'s  a solution recommended by DYFS, the state agency entrusted to investigate and assist the court in these delicate matters.
We are satisfied from the record herein that the criteria pertinent to a preliminary hearing as set forth in N.J.S.A. 9:3-24 and 25 have been met.
The reports of DYFS establish unequivocally that the natural mother, a high school student of 16 years, has in fact forsaken her parental obligations toward this child. N.J.S.A. 9:3-18(d) defines the phrase "forsaken parental obligations" to mean "wilful and continuous neglect or failure to perform the natural and regular obligations of care and support of a child." This has been further construed as "a course of conduct amounting to intended abandonment or very substantial *491 neglect of both parental duties and claims, with no reasonable expectation of any reversal of that conduct in the near future." In re Adoption of Children by D., supra, 61 N.J. at 94-95.
As we have noted, on September 27, 1977 the mother signed an affidavit in the presence of two witnesses and a notary public which explicitly reflects her desire and intent to give up the child for adoption. Regardless of the legal effect of this document as a binding release if she had contested the adoption, it stands as a memorial of her intention to relinquish permanently any further right or interest in that child. Her decision in this regard was echoed by her parents, who also signed the document.
Since that date she has not made a single move toward seeing the child, inquiring as to his well-being, or asserting a desire to change her mind. Her commitment to the decision to abandon the child forever without expectation of a reversal is further exhibited by the document which she signed in April 1978 in response to the supplemental investigation by DYFS, wherein she reiterated that it would be in the best interests of the child if he were adopted and that it is still her desire that the adoption take place.
Without any contrary evidence in the record, it is apparent that realistically this young mother has intentionally abandoned her child together with any claims to him, and that she has not and will never undertake parental obligations or duties toward that child. Under such circumstances her parental rights should be terminated. See In re Adoption of One Child by R.A.C., 154 N.J. Super. 513, 517-518 (App. Div. 1977), certif. den. 75 N.J. 607 (1978); In re Adoption of a Child by R.D., 127 N.J. Super. 311 (App. Div.), certif. den. 65 N.J. 292 (1974).
In addition, it cannot be denied that plaintiffs are eligible and qualified as suitable adoptive parents and the child is fully and happily adjusted to them. The trial judge found that "they qualify financially and culturally, but they do not qualify legally." DYFS submitted a report which paints the *492 T.'s as two educated individuals, in their thirties, who have provided a fine home for the baby and another adopted child. And in a letter to the judge of August 11, 1978, that agency described them as "loving and concerned parents who are able to provide for the child's well being."
On the totality of the record we have no hesitancy in exercising original jurisdiction under R. 2:10-5, and conclude that the prerequisites of a preliminary hearing have been met. See In re Adoption by B., 63 N.J. Super. 98, 104 (App. Div. 1960). We therefore reverse the judgment below and direct that the complaint be reinstated. The trial court shall thereupon enter an order reciting that (1) the parental rights of the mother are terminated and that she has no further right to custody of the child, (2) the child is potentially fit for adoption, (3) plaintiffs are potentially fit to adopt the child and to provide a home suitable for the rearing of the child, and (4) fixing an early date for final hearing in accordance with the provisions of N.J.S.A. 9:3-25.
NOTES
[2] We reach this conclusion without resorting to improper material, as did the trial judge, such as the investigation of the black market in babies by the Bergen County Prosecutor or the indictment of plaintiffs' trial attorney in connection therewith.
[3] The only case to the contrary cited in the opinion below is that of the Family Court, Dutchess County, New York  In re Adoption of Anonymous, 46 Misc.2d 928, 261 N.Y.S.2d 439 (Cty. Ct. 1965). That case is neither persuasive nor controlling.