**In Re: Adoption of Baby Boy L.**

### PROCEDURAL HISTORY

MUROSKI, *J.*, May 27, 1983—On September 10, 1982, Ms. D. ** filed a petition for permission to re-

---

** Surnames will be referred to only by initial throughout this opinion in keeping with the confidentiality of the Adoption Act and in all cases the initials have been changed so as not to coincide with the actual initials.

linquish parental rights to her infant baby boy who was less than one week old. The petition listed the natural father as unknown. The intermediary was Attorney A. The court set a hearing on the petition for voluntary relinquishment for October 12, 1982. At that time, a hearing was held and a decree of voluntary termination of the rights of Ms. D. was entered. Included in the court order was an authorization allowing Mr. and Mrs. C. to institute proceedings to adopt the baby boy. Mr. and Mrs. C. had filed the report of intention of adopt on September 10, 1982. The report indicated that the infant was delivered into the physical custody of Mr. and Mrs. C. on September 9, 1982.

A petition for adoption was filed on March 9, 1983, by Mr. and Mrs. C. Attorney A. filed the petition for adoption as counsel for Mr. and Mrs. C. On the same day, the report of the intermediary was filed by Attorney A. A hearing on the petition for adoption was scheduled for April 18, 1983. Due to a scheduling conflict, the court moved the hearing up to April 6, 1983, at which time a hearing was held.

## STATEMENT OF FACTS AND DISCUSSION

The court has no hesitancy whatsoever in granting the petition for adoption filed by Mr. and Mrs. C. The court has no reason to doubt that they will be excellent parents to Baby Boy L., and will provide him with a loving home environment. The court, however, wishes to take this opportunity to address two practices which are present in this adoption which the court believes are improper.

In the present action, Attorney A. served as both the intermediary and as Attorney for the adoptive parents throughout the proceedings. Attorney A. is

to be paid $5,000.00 for his "counsel fees". The existence of these two factors in this case compelled the court to closely examine the appropriateness of the activity of the intermediary and determine whether or not the Adoption Act has been violated.

An "intermediary" is defined by 23 Pa. C.S.A. §2101 as "any person or persons or agency acting between the parent or parents and the proposed adoptive parent or parents in arranging an adoption placement." Any person may be an intermediary in the Commonwealth of Pennsylvania. There is no license requirement and no regulation whatsoever. The intermediary is to act as the go-between between the adoptive parents and the natural parents. The intermediary insures that the identity of the adoptive parents remains secret from the natural parents. In essence, an intermediary acts as a buffer to have a smooth transition for the child.

In practice, the intermediary assumes a far greater role than what is spelled out in the Adoption Act. Very often, the intermediary selects the adoptive parents. The Adoption Act contains no requirements to determine how the intermediary selects the adoptive parents in making a placement. The Adoption Act operates on the theory that any errors in the placement with the adoptive parents by the intermediary are corrected by the court after review of the report of the intermediary and after the adoption hearing in which the court investigates the appropriateness of the placement. The court also has available an independent investigation performed by a court officer. This system has its drawbacks. Most private intermediaries place an infant with the proposed adoptive parents immediately after birth. Often times, the investigation is not conducted until six months after the child was then with the pro-

posed adoptive parents. When the investigation occurs, it is the investigating of an accomplished fact. The court would be very reluctant to alter custody of a child awaiting adoption under these circumstances. If a deficiency is discovered in the character of the adoptive parents, this would have to be weighed with the extended time period in which the child has resided with the adoptive parents. In many cases, the adoptive parents are the only parents the child has known. This leads to difficult decisions. The initial choice of adoptive parents is solely within the province of the intermediary. If there are two capable couples awaiting an adoption placement, the intermediary makes the decision solely within his own discretion. It is not hard to imagine such adoptive couples competing to be selected by the intermediary and offering the intermediary incentives.

The Intermediary should be more than a mere go-between of the adoptive parents and the natural parents. As the intermediary makes the initial choice as to where a child is placed, that person should take great care to insure that the child is placed in a proper home environment. No other considerations should come into play except what is in the best interests of the child.

In the present case, Attorney A. played three roles in the adoption. First, he was the individual who procured a child for placement. Secondly, he served as intermediary; and thirdly, served as attorney for the adoptive parents. It is quite obvious that the natural mother was referred to Attorney A. in order to place her child for adoption. Attorney A. is not in the business of soliciting babies and, therefore, a referral had to have been made to him from someone unidentified in the record. The attorney then made ar-

rangements for the placement of the child with adoptive parents from his existing list of potential parents. One couple was selected and the child was immediately placed with them at birth. The attorney prepared all documetns necessary for the relinquishment and adoption. In essence, the attorney represented everyone. This practice shortchanges the fundamental principle of the Adoption Act. If a natural mother chooses to revoke her consent to the adoption, for example, five months after placement, but before the relinquishment hearing, a right guaranteed her by the Adoption Act, what role does the attorney assume: intermediary to obtain the return of the child or counsel for adoptive parents to attempt to prevent it? The conflict is obvious.

It is best to contrast what occurs in a private placement with what occurs in a public agency placement to highlight the deficiencies of private placement. When a mother-to-be goes to a licensed, reputable adoption agency for placement of the child, she is first given extensive counseling on her decision. If she decides to continue, the child after birth is placed with adoptive parents who have undergone great scrutiny before they are approved as adoptive parents. A child is usually not placed with adoptive parents until after the parental rights of the natural parents have been terminated. This is to guard against natural parents exercising their rights to revoke a consent to an adoption prior to the entry of the final termination decree and, thus, disrupting adoptive parents' lives. The fees charged by a public agency are directly related to the costs of the adoption. Many charge no fees at all other than the costs of administration and the hospital expenses of the mother and child. The agency performs a viable public service.

The most startling fact in the case before this court is that Attorney A. is to be paid $5,000 for his services. This is in addition to the payment by the adoptive parents of all costs associated with the hospitalization of the natural mother, the birth of the child, and legal documents. There is simply no way to justify a $5,000 attorney fee in this case. This case was a routine adoption proceeding. The petitions compiled by Attorney A. are form petitions provided by the court. The relinquishment hearing and the adoption hearing combined did not last more than one hour. The relinquishment was voluntary by the natural mother; the natural father is unknown. This was not a difficult case. The intermediary lists the $5,000 fee as solely for counsel fees and is not as a service as an intermediary.

The court is greatly concerned about the fee charged by Attorney A. to the adoptive parents. The fee is obviously not related to the value of Attorney A.'s work. Still, the adoptive parents agreed to pay the $5,000 fee and, in fact, were quite willing and even eager to do so. This is quite understandable that at the conclusion of all proceedings, they became the parents of a baby boy. The fee raises a great many questions with this court. The prime question is whether Mr. and Mrs. C. would be the adoptive parents of Baby L. if they were unable to pay $5,000.

It is a crime within the Commonwealth of Pennsylvania to engage in the practice of baby selling. Section 4305 of the Pennsylvania Crime Code states simply "a person is guilty of a misdemeanor of a first degree if he deals in humanity by trading, bartering, buying, selling, or dealing with infant children." If a natural mother offered to have her infant adopted by the parents who pay her the highest possible price,

it would be a violation of this act. A payment for a baby disguised as an attorney's fee will also be a violation of this act. In the present case, the court sees this issue as needing investigation and comment.

The $5,000 fee by Attorney A. taints the entire adoption process. In order to be considered for placement by Attorney A., must you be willing to pay $5,000? if this is a set fee, obviously only people who can afford to pay this fee would make the list maintained for adoption purposes by Attorney A. Once a natural mother comes to Attorney A. for adoption purposes, his prime motivation could be to get his fee upon conclusion of the adoption proceeding. The best interests of the child can quite easily be lost in the shuffle. Where there is a combination of the attorney serving all three roles in the adoption proceeding with a $5,000 fee, the problems become more apparent. From the moment the natural parent walks into the attorney's office, that attorney's goal is to have an adoption. Counseling for the natural mother would certainly have a low priority. The selection of the adoptive parents would have another criterion: an ability to pay a professional fee. It is easy to imagine an attorney overlooking some character deficiency in the adoptive parent when that parent can afford to pay the professional fee and disqualifying another couple who would be excellent parents but cannot afford to pay the fee. The adoptive parents would be very reluctant to contest or dispute the fee charge by the attorney and jeopardize the adoption.

Mr. C., the adoptive parent of the child, is an attorney. Mr. and Mrs. C. enjoy a substantial income. They reside in another state. A $5,000 professional fee payment would not be a hardship upon them.

Mr. C. took great care to testify in support of the attorney's fee, maintaining that he fully agreed to pay that amount and that he felt it was fair and reasonable. Nonetheless, due to the extraordinary circumstances surrounding the adoption, the court believes that it must rule upon the appropriateness of the fee in this case and future cases.

## STATEMENT OF THE LAW

The Adoption Act contains no prohibition against an individual procurring a child, serving as an intermediary, and as counsel for the adoptive parents. In most instances, this leads to no problems. The better practice would be for different individuals to serve as the intermediary and as counsel for the adoptive parents. In this way, the intermediary would have only one prime function, the best interests of the child. The attorney would, of course, serve as counsel for the adoptive parents in all respects. This would prevent even the appearance of a conflict of interest to arise. The Adoption Act is silent on this issue. This court would be very reluctant to establish by case law prohibition against an individual serving in both roles. This wil have to be a function for the legislature. The court can only act in individual cases to correct problems. This court does have, however, the power to review and regulate the fees charged by parties to an adoption.

Traditionally, the fee charged by an attorney is a private contract between the parties. In most cases, a court would be very reluctant to interfere with this type of contract. In adoption matters, to guard against abuses, the court adjudicating the adoption has the express authority to review fees charged and to correct abuses. The court intends to do so in the present case.

The Canons of Professional Ethics governing lawyers establishes in Disciplinary Rule No. 2-106 the guidelines for charging of fees. Anything in excess of a reasonable fee is prohibited. The Canons of Professional Responsibility are more than guidelines in the Commonwealth of Pennsylvania in that they have been enacted by the Supreme Court as governing the profession. In the present case, the $5,000 fee clearly is excessive. The time and labor required for the proceeding was minimal and there were no novel or difficult legal questions involved. Any competent attorney could have performed the same services. The charge is much greater than what is customarily charged for similar legal services within Luzerne County. The court firmly believes that this fee is excessive and is not in proportion to the value of the legal services performed by Attorney A.

The Adoption Act requires disclosure of all fees paid by anyone in conjunction with the adoption in order to eliminate hidden payments. The report of intention to adopt must include an itemized accounting of monies and consideration paid or to be paid to the intermediary. 23 Pa. C.S.A. §2531(b)(5). The report of the intermediary must contain an itemized accounting of monies and consideration paid or to be paid to the intermediary or to any other person due to the adoption placement. 23 Pa. C.S.A. §2533(8). Luzerne County O.C. Rule (15)(5)(d) also requires by local rule the disclosure of all fees and costs paid or to be paid to any person in an adoption proceeding. It is clear that all fees and costs must be disclosed to the court in an adoption proceeding. Through the disclosures contained in the documentation of this case, the court became aware of the $5,000 counsel fee charge.

There is no dispute that this court is the proper court of jurisdiction in this matter. 23 Pa. C.S.A.

§2301. When the Adoption Act was amended in 1982, this court received express authority to issue appropriate relief when the Court deems monies or consideration paid to be excessive. 23 Pa. C.S.A. §2533(c). This amendment was added to the Act to allow the court to correct abuses in the payments of fees associated with adoptions.

In the present case, the court has rendered a decision that, at least initially, the fee of Attorney A. for counsel fees is excessive. This court is inclined to reduce the amount of the fee to more accurately reflect the value of services rendered. The court will direct that Attorney A. file a comprehensive affidavit which shall include a breakdown of all legal services performed by Attorney A., which shall include the days on which the service was performed and the length of time needed. The court shall also direct that a copy of the written fee agreement, if any, be produced for the court's review. After reviewing these documents, the court shall issue an order setting the fee to be paid to Attorney A. The court wishes to stress that it does not believe that any criminal activity occurred in this case. The court does note, however, that "baby brokering" is a national problem and that there have been many criminal prosecutions arising from the adoption placements. (See 3 A. L. R. 4th 468). The United States Congress has recognized the problem with private adoption placements and has adopted a statute to establish model adoption legislation and procedures. The Congress has ordered a $5,000,000 study of unlicensed or unregulated adoption placements to determine if federal intervention is necessary. (42 U.S. C. S. §5114). Until Congress or the State Legislature acts, it is the duty of this Court to regulate the adoption placements.

In that the amendment to the Adoption Act specifically authorizing the Court to regulate fees has been law for less than one year, this Court has been unable to find any recorded opinions. There are two cases from other jurisdictions, however, which express valid legal conclusions which should be applied to Pennsylvania cases. In People v. Schwartz, 64 I.R.L. 2d 275, 356 N.E. 2d 8, (1976), Cert. Den. 429 U.S. 1098, 51 L. Ed. 545, 97 S. Ct. 1116, the Supreme Court of Illinois ruled that a payment of $4,500 to an attorney which was above the computable medical and hospital fees in adoption placement to be illegal compensation and potentially a violation of Illinois law. The Court ruled tht a payment in excess of the value of the service performed could be interpreted as a payment *for* the child. The case was returned to the Lower Court for criminal prosecution of the attorney. In the case of In Re: Adoption of Child by T., 164 N. J. Super. 476, 397 A. 2d 341 (1978), the Superior Court of New Jersey dealt with the payment of fees in an adoption proceeding. New Jersey has a statute which prohibits individuals from serving as intermediaries. In this case, an attorney was paid $2,500 for "so-called legal fees" to arrange the delivery of a child from Arizona to a New Jersey couple for adoption. The lower court not only set aside the fee payment but denied the adoption. The lower court stated that to allow the adoption would be tantamount to rewarding illegal activity and that the only way to insure the end of black market baby selling was to put potential adoptive parents on notice that their scheme would not succeed. The Superior Court reversed the denial of the adoption, concluding that the child was placed with a good family and that removing a child would be harmful at the present time. The Superior Court also dealt harshly with the lower

court's ruling on the fees of the attorney. The Superior Court felt that the civil remedy afforded the trial court judge was not strong enough and that the proper procedure was simply to report the attorney involved to the authorities for criminal prosecution. This court does not feel that either of these situations are present in the case now before it but wishes to cite them as examples as what types of abuses may occur in an adoption proceeding and, thus, necessitate strict scrutiny by the court.

## ORDER

And now, this May 27, 1983, after hearing held, the court, being satisfied that the requirements of the Adoption Act have been met, and that the needs of the welfare of Baby Boy _____ were promoted by his adoption, the court hereby orders and decrees that said Baby Boy _____ shall be the adopted child of _____ and _____ his wife, and shall have the rights of the child in heirs of said petitioners and be subject to the duties of such child and is hereafter named and known as _____.

It is further ordered and decreed that counsel for the adoptive parents submit to this court within ten days of the date of this decree an affidavit which outlines all services rendered by counsel which shall include the day on which the service was rendered and the amount of time spent in rendering said service. The court also directs that any written fee agreements be attached to said affidavit. At that time, the court shall issue a further order setting the amount of fee to be paid by the adoptive parents to counsel.

Compliance herewith is directed.