808 P.2d 1083 (1991)
In the Matter of the ADOPTION OF W.A.T., V.E.T., J.T.T., J.S.T., J.L.T., and B.D.T., Minors.
Pat JOHANSON, Janet Johanson, and Calvin Johanson, Intervenors and Appellees,
v.
Vaughn FISCHER and Sharane Fischer, Petitioners and Appellants.
No. 890053.
Supreme Court of Utah.
March 26, 1991.
David Nuffer, Steven E. Snow, St. George, for petitioners and appellants.
Dale R. Chamberlain, Calvin L. Rampton, Timothy B. Anderson, Jan C. Graham, Michael Patrick O'Brien, Michael R. Shaw, St. George, for intervenors and appellees.
V. Lowry Snow, St. George, for W.A.T.
R. Paul Van Dam, Paul M. Tinker, Salt Lake City, for amicus State of Utah.
Patricia W. Christensen, Salt Lake City, for amicus Utah Children.
Brad L. England, Salt Lake City, for amicus American Civil Liberties Union.
DURHAM, Justice:
This is an appeal from an order of the district court dismissing petitioners' petition to adopt six children, five of whom are minors, on the ground that petitioners have organized their family according to their religious belief in plural marriage. We reverse.
Petitioners Vaughn Fischer and Sharane Fischer are legally married and reside in Washington County with their four children. Also residing with them is Katrina Stubbs, whom Vaughn also "married" in accordance with petitioners' religious belief and practice of plural marriage. Two children have been born to Vaughn and Katrina. On June 17, 1987, Vaughn "married" a third "wife," Brenda Thornton. On June 30, 1987, petitioners filed the instant petition, seeking to adopt six children born to Brenda and Joseph Phil Thornton.[1] The Thorntons were members of the same fundamentalist church[2] as petitioners, and *1084 Brenda was a plural "wife" of Joseph. The Thorntons appeared in the court below on the day the petition was filed and, in accordance with Utah Code Ann. § 78-30-8, gave their written consent to the proposed adoption. Petitioners claim that Brenda knew she was dying at that time. Brenda died on August 15, 1987.
Intervenors Janet and Patricia Johanson, half-sisters of Brenda, and Calvin Johanson, father of Brenda, moved to dismiss the adoption petition. The trial judge carefully articulated that the only issue before him was whether petitioners' teaching and practicing polygamy "disqualified" them from adopting the Thornton children. Petitioners admitted that Vaughn knew his "marriage" to Katrina was in violation of Utah law proscribing bigamy. The trial court "assumed for the purposes of the motion" that petitioners were fit and proper persons to adopt the children in all respects other than their practice of plural marriage and that they were sincere in their religious belief in that practice. The court ruled as a matter of law that petitioners' criminal conduct in teaching and practicing plural marriage made them ineligible to adopt the children. In essence, the court held that the "interests of the child" standard by which Utah adoptions are to be measured can never be met when the adoption places the child in a home where polygamy is taught and practiced. The court granted the motion to dismiss and ordered petitioners to turn the minor children over to the Utah State Division of Family Services for placement in another home, but stayed that order pending an appeal to the court of appeals, which has appellate jurisdiction over adoption cases. See Utah Code Ann. § 78-2a-3(2)(g) (now codified at § 78-2a-3(2)(h) (1987)). After the appeal was filed, the court of appeals certified the case to us for "original appellate review and determination." Id. at § 78-2a-3(3). Petitioners appeal, assailing the dismissal on several grounds.[3]
At the outset, it is important to reiterate that this is not an appeal from an order denying a petition for adoption. It is an appeal from an order dismissing a petition for adoption. The only issue before us is whether petitioners, who are legally married, may be denied a hearing and specific factual findings on their adoption petition on the sole ground that they believe in and practice plural marriage, a doctrine espoused by their religious group.
Section 78-30-1 of Utah Code Annotated says, "Any minor child may be adopted by any adult person." The governing standard and procedure are set forth as follows:
78-30-8. ProcedureAgreement of adopting parents.

The person adopting a child and the child adopted, and the other persons whose consent is necessary, must appear before the district court of the county where the person adopting resides, and the necessary consent must thereupon be signed and an agreement be executed by the person adopting to the effect that the child shall be adopted and treated in all respects as his own lawful child....
78-30-9. Order of adoption.

The court must examine all persons appearing before it pursuant to the preceding provisions, each separately, and, if satisfied that the interests of the child will be promoted by the adoption, it must make an order declaring that the child shall thenceforth be regarded and treated in all respects as the child of the person adopting.
(Emphasis added.)
The statutes governing adoption contain certain minimum requirements to be met *1085 by adopting petitioners; for example, a single person (or one member of a married couple) must be at least ten years older than the child adopted, and married people cannot adopt without consent of their spouses. Utah Code Ann. §§ 78-30-2, 78-30-3. Aside from these technical requirements, there are virtually no restrictions on or exceptions to the right to petition contained in the statute. The sole standard for permitting adoption itself is that the trial court, after a hearing, must "be satisfied that the interests of the child will be promoted by the adoption...." Utah Code Ann. § 78-30-9.
The result of the trial court's dismissal of this petition is to engraft upon the statute a type of "public policy" requirement that prohibits certain kinds of "wrongdoers" from judicial review of the merits of their petitions for adoption. The trial court justified its modification of the statute by the language in Utah's constitution announcing that "polygamous or plural marriages are forever prohibited." Utah Const. art. III, § 1. We emphasize that this is not a case in which the courts have been asked to review a legislative determination that a specific status or specific acts should render one ineligible to petition for adoption. Rather, the trial court in this case has itself undertaken such a determination. We find no justification in the language of the state constitution or criminal statutes for overstepping the proper prerogatives of the courts in this fashion.
The fact that our constitution requires the state to prohibit polygamy does not necessarily mean that the state must deny any or all civil rights and privileges to polygamists. It is true that bigamy is a crime in Utah and that one of the petitioners here is concededly a bigamist. The same portion of the criminal code ("Offenses Against the Family") which makes bigamy a crime, however, also criminalizes adultery, fornication, nonsupport of children, surrogate parenthood contracts, and unauthorized abortions. See generally Utah Code Ann. §§ 76-7-101 to -325. Innumerable other acts are of course defined as crimes by other portions of the criminal code. It is not the role of trial courts to make threshold exclusions dismissing without consideration, for example, the adoption petitions of all convicted felons, all persons engaging in fornication or adultery, or other persons engaged in other illegal activities. There is likewise no legitimate basis for the courts to disqualify all bigamists (polygamists) as potential adopters. As noted above, only one of the petitioners in this case, Vaughn Fischer, is guilty of bigamy. Sharane Fischer is legally married to him and is not alleged to have violated any criminal statutes.
The role of the trial court in this highly sensitive area of child adoption is to hold a hearing, review all evidence regarding the specific characteristics of the petitioning parents and the child or children to be adopted, evaluate that evidence, and make a careful factual determination regarding whether the placement will best promote the interests of the child or children at issue. See § 78-30-9. The trial judge in this instance skirted this legislatively mandated judicial obligation by concluding that the alternative lifestyle of these prospective adoptive parents per se made them ineligible to petition for adoption.
A New Jersey court addressed an analogous situation in In re Adoption of a Child by I.T., 164 N.J.Super. 476, 397 A.2d 341 (1978). The trial court dismissed an adoption complaint on the sole ground that the prospective adoptive parents had participated in the illegal placement of the child.[4] The court recognized both the trial judge's dilemma in seeking to enforce the legislative policy against commercial traffic in babies and the judge's efforts to maintain the judicial system's integrity by denying an adoption tainted by illegality of placement. *1086 Id., 397 A.2d at 344. Nevertheless, the court found no legal warrant under the state's controlling legislation or judicial precedents to apply any standard other than the best interests of the child. Id. The court stressed that the equitable doctrine of "clean hands" has no place in such a proceeding, where the paramount focus must be on the best interests of the child. Id.
We agree with the New Jersey court that enforcing criminal laws is a matter wholly separate from the function of the court in an adoption proceeding. The fact that the petitioning prospective parents engage or have engaged in activities prohibited by statute or the constitution is one factor the court must consider when determining whether the specific placement at issue would promote the interest of the child to be adopted. Prospective adoptive parents' illegal or unconstitutional conduct, however, is not properly considered as a threshold determination in an adoption petition; rather, such conduct is subsumed by the interest of the child standard.
In this case, the trial court improperly and prematurely considered the interests of the child test on a motion to dismiss. We acknowledge that a fully developed record may in fact indicate that the interests of these children will not be promoted by permitting their adoption by these petitioners for any number of reasons that may emerge upon investigation and hearing, including their polygamous familial and religious lifestyle. The result of the trial court's decision, however, is that no children may ever be adopted by any people who associate themselves with this practice, regardless of the particular circumstances surrounding the adoption issue. Other relevant circumstances could include the alternatives available to the children, the actual nature and content of the adopter's lifestyle, the existence and quality of an ongoing relationship between the adopter and the child, and any special needs of the child.
To illustrate the possible relevance of such factors, we pose the following hypothetical questions. What if there were no willing relatives or other suitable adopters and dismissing a petition meant foster placement and separating siblings? What if the practicing polygamists seeking to adopt were unwilling to abandon their commitment to the lifestyle but strongly opposed promoting it to their children? What if the child to be adopted were so severely physically or mentally handicapped that he or she could never participate in plural marriage but facts indicated that a polygamous family could provide optimal specialized care? We do not suggest that any of the foregoing circumstances exist here; we cite them only to demonstrate that the adoption decision is fact-specific, and neither the statute, the constitution, nor good public policy justifies a blanket exclusion of polygamists from eligibility as adoptive parents.
The Utah adoption statute, Utah Code Ann. §§ 78-30-8, -9, requires a full-scale evidentiary hearing and evaluation hearing, a process petitioners were entitled to but did not receive. We therefore reverse the decision of the trial court and remand for a specific factual determination regarding whether the interests of the Thornton children would be promoted by granting the Fischers' adoption petition.
ZIMMERMAN, J., concurs.
STEWART, Justice (concurring in the result):
I agree that the district court's order should be reversed and the case remanded for a factual hearing on the issue of whether the Fischers' adoption petition, if granted, would be in the best interests of the Thornton children. Since I am unable to concur in Justice Durham's opinion, but do concur in the result, I write separately to explain the reasons for the result I reach.
In my view, the trial judge ruled as a matter of law that Vaughn and Sharane Fischer, who live together in a polygamous marriage, did not qualify as putative adoptive parents of the six Thornton children, who were children of another polygamous marriage. Since Sharane Fischer is the first wife of Vaughn Fischer, it can be stated that she is not living in violation of *1087 the state bigamy statute. However, her husband, Vaughn Fischer, is married to two other wives and is in violation of the statute.
I disagree with Justice Durham on the issue of the power of the courts to place a judicial gloss upon broad statutory terms such as § 78-30-9, which establishes the standards for granting a petition of adoption. That section requires that a court be "satisfied that the interests of the child will be promoted by the adoption...." The gloss the trial court placed on the statute was that putative adoptive parents living in a polygamous marriage are disqualified as a matter of law to adopt. This Court has, over the years, placed judicial glosses on a number of statutory terms such as "public interest." I do not think that courts are powerless to do so under § 78-30-9. As I read the record, the trial judge did just that and held that because polygamy is contrary to the fundamental policy of the state of Utah and because the Fischers are polygamists, they are disqualified from adopting. Although I am of the view that the trial court had the power to do that, I disagree that as a matter of judicial policy polygamy should be considered an absolute bar in all cases.
As I view the matter, the issue is not whether polygamous adults who wish to adopt have a right to a hearing with respect to an adoption petition; rather, it is whether children who are subject to adoption have a right to have as adoptive parents those who may be the only people who can give the children the reasonable nurture, care, guidance, and love as a foundation for realizing their highest potential as human beings. The factual context in which the need for adoption arises can be of critical importance in determining the best interests of the child. As Justice Durham properly points out, critical factual differences may well exist in different cases, and for that reason, the existence of a polygamous relationship on the part of putative adoptive parents must be considered a significant, although not necessarily a determinative, factor in an adoption proceeding.
Not only is polygamy a factor that weighs against adoption, but it is a factor which I believe must be given considerable weight and, in at least some cases, will be the determining factor. I am aware that in so stating, I have not defined a precise, workable standard, but this is the kind of case in which a trial judge should not be bound by such rigid standards that one's best wisdom in the exercise of highly equitable powers must be abandoned. The lack of specificity places a premium on the trial judge's judgment. I emphasize that I consider polygamy neither a neutral factor nor a determinative factor as a matter of law in adoption proceedings. There must be clear and solid reasons based on the present and future welfare of the children to justify an adoption by polygamous parents.
The fundamental question is not whether polygamists are denied a privilege or right or are otherwise disadvantaged because of the state constitutional and statutory prohibitions against polygamy. The question is, rather, whether children subject to adoption should be adopted by adults who are living in a continuous, ongoing violation of the law concerning one of the most fundamental institutions in society. Polygamy is more than just an "alternative lifestyle," as that term is sometimes used in describing a manner of living that is unorthodox and outside the accepted norms and established customs of society. Having said that, I add that I do not subscribe to a view that condemns polygamists as being depraved or debased. Much evidence suggests that polygamists, as they are generally known in this state, are honest and hardworking. My point is not that polygamy raises an issue of moral (in the broadest sense) inferiority on the part of those who practice it, but rather, that the people have a right through constitutional and legislative enactments to determine how the most basic social unit in society should be organized. That judgment has the most profound ramifications for many fundamental concerns, such as views about the roles of women and men, the rearing of children, education, and many other kinds of basic values society *1088 deems appropriate to promote by a monogamous family structure.
I do not believe that the exceptionally thorough, thoughtful, and extensive briefing that has been submitted in this case by the parties and amici showing evidence of changes in moral, sexual, and even law enforcement valueseven if taken at face valuejustifies this Court in concluding that the state's fundamental legal policy concerning polygamy should be viewed differently by this Court. Nor do I believe that the concept of desuetude, even if factually proved, would justify this Court in ignoring our Constitution, statutes, and the enabling act, which require and establish the basic policy of this state.
In my view, Senior Judge O. Sherman Christensen's thoughtful and scholarly opinion in Potter v. Murray City, 585 F.Supp. 1126 (D.Utah 1984), aff'd, 760 F.2d 1065 (10th Cir.), cert. denied, 474 U.S. 849, 106 S.Ct. 145, 88 L.Ed.2d 120 (1985), reaches the proper conclusion both as to what state policy is and the current state of federal constitutional law on the issue of polygamy and religious freedom under the First Amendment to the United States Constitution.
Perhaps, as Justice Howe suggests, an evidentiary hearing on remand of this matter will not end in a different result, but I do not prejudge what conclusion the trial judge might reach. In all events, to me it seems necessary to let the relevant facts be developed and the issue decided in light of the judge's considered judgment.
HOWE, Associate Chief Justice (dissenting):
I dissent. The trial judge did not rule that the petitioners were "ineligible" to adopt the children. He did not purport to add to the statutory qualifications of persons who may adopt. Although he stated in his memorandum decision that the petitioners "do not qualify as persons to whom these children should be placed for adoption," the petitioners concede that his decision was not based on failure to qualify under our adoption statutes.
The intervenors, who are aunts and a grandfather of the subject children, moved the trial court to dismiss the adoption petition based on certain uncontested facts and findings of fact previously entered by the trial court. In response to the motion, the petitioners submitted the affidavit of their religious leader and a home study. With those facts and documents before him, the trial judge assumed for the purposes of the motion that the petitioners were fit and proper persons to adopt the children in all respects except that they were living in polygamy. In making his ruling, he articulated that the basic issue before him was whether the "interest of the child will be promoted by the adoption ..." as required by Utah Code Ann. § 78-30-9. He concluded that it would not be in the best interest of these children to be reared in a home where polygamy was taught and practiced. I find no error in this ruling. The judge had before him all the facts which both parties desired to present, and by his assumption he gave the petitioners the benefit of every doubt. In essence, his ruling was that in this case, the petitioners' teaching and practicing polygamy in their home outweighed the factors which ran in favor of the petitioners. He did not purport to announce a rule that would be binding on other judges in other cases where the facts might be different. The extreme examples posed by the majority opinion simply are not present in this case and are not even suggested by the petitioners. His ruling was made, as it had to be made, only for the purposes of the case before him.
No one has a right to adopt; it is the extension of a privilege, see 2 Am.Jur.2d Adoption § 3 (1962). Determination of "the interests of the child" requires the weighing of factors favorable to the proposed adoption against any unfavorable considerations. In the instant case, the trial judge assumed that the petitioners were "fit and proper persons" to adopt except that in their home, where the children would be raised, plural marriage was taught and practiced in contravention of a criminal statute of this state. Utah Code Ann. § 76-7-101 provides:

*1089 (1) A person is guilty of bigamy when, knowing he has a husband or wife or knowing the other person has a husband or wife, he purports to marry another person or cohabits with another person.
(2) Bigamy is a felony of the third degree.
Utah's constitution also prohibits plural marriages. Article III provides:
The following ordinance shall be irrevocable without the consent of the United States and the people of this State:
....
First:Perfect toleration of religious sentiment is guaranteed. No inhabitant of this State shall ever be molested in person or property on account of his or her mode of religious worship; but polygamous or plural marriages are forever prohibited.
Petitioner Vaughn Fischer was already married to the other petitioner, Sharane Fischer, when he purported to marry Katrina Stubbs. The three of them live in the same household together with children of Mr. Fischer born by both Sharane and Katrina. If the adoption were granted, the six Thornton children would be permanently added to this family, where on a daily basis they would be exposed to the teachings and practice of plural marriage. It would be difficult to conceive of a factor which works more against the "interests of the child[ren]" than ongoing criminal conduct by the adoptive parents in the home where the children are being nurtured and raised. I cannot conceive of any factor or combination of factors favorable to an adoption or qualities which proposed adopting parents could offer which would outweigh the detrimental effect of felonious conduct engaged in by them. Teaching and demonstrating to children on a daily basis that the statute proscribing bigamy may be ignored and flaunted may well breed in the children a disrespect for observance of other laws. Since the children will probably spend their lives in this nation where the voluntary observance of all laws by its citizens is necessary, these six children may never be taught that valuable lesson of citizenship. The state in its role as parens patriae of the children owes a high duty to them in approving whoever shall adopt them. In re Simaner's Petition, 15 Ill.2d 568, 155 N.E.2d 555 (1959); Eggleston v. Landrum, 210 Miss. 645, 50 So.2d 364 (1951). That duty would not be met in granting the privilege to adopt to the petitioners, who live on a daily basis outside the law.
The majority now orders an evidentiary hearing which will be fruitless because the trial judge has already made an assumption which is as favorable to the petitioners as can be had. The fact remains, and they have not attempted to deny it, that polygamy is taught and practiced in the home in which these children will be raised. That fact will not change on remand. We have previously held in Wilson v. Family Services Division, 572 P.2d 682 (Utah 1977), that we will not interfere with a trial court's judgment in an adoption unless the action was clearly arbitrary or capricious or was not based on the evidence. No such showing has been made. I would affirm the dismissal.
HALL, C.J., concurs in the dissenting opinion of HOWE, A.C.J.
NOTES
[1] The polygamous relationship between Brenda and Joseph Phil Thornton was dissolved prior to the filing of the adoption petition.
[2] This religious organization, referred to by Vaughn as the Church of Jesus Christ of Latter-Day Saints and the Kingdom of God, continues practicing polygamy as originally advocated by the Church of Jesus Christ of Latter-Day Saints in the late nineteenth century. At present, the Church of Jesus Christ of Latter-Day Saints prohibits the practice of polygamy by its members. Doctrine and Covenants, Official Declaration-1 (September 24, 1890) (declaration by Wilford Woodruff, President of the Church of Jesus Christ of Latter-Day Saints, in which he submits to the laws enacted by Congress forbidding plural marriages).
[3] Because we decide this case on the ground that the trial court improperly denied petitioners a comprehensive evaluation hearing as the statute requires, we need not reach their other arguments on appeal.
[4] The record in the New Jersey case was apparently considerably more developed than the record the trial judge had before him in this case, as indicated by the appellate court's conclusion that it was "evident from the record and the DYFS [Division of Youth and Family Services] that plaintiffs [were] eminently qualified to undertake parenthood of the child and that it [was] to the best interest of the child that he remain in their custody for ultimate adoption." Id., 397 A.2d at 342.